IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE

AT NASHVILLE

FEBRUARY 1998 SESSION



FILED

June 9, 1998

Cecil W. Crowson
Appellate Court Clerk

| | | |
|---|---|---|
| STATE OF TENNESSEE, | ) | |
| | ) | |
| Appellee, | ) | C.C.A. No. 01C01-9703-CC-00099 |
| | ) | |
| vs. | ) | Montgomery County |
| | ) | |
| DONALD GENE BROOKS, | ) | Hon. John H. Gasaway, Judge |
| | ) | |
| Appellant. | ) | (First Degree Murder, |
| | ) | Especially Aggravated Robbery, |
| | | Theft, Setting Fire to |
| | | Personal Property) |

FOR THE APPELLANT:

**GREGORY D. SMITH (on appeal)**
Attorney At Law
One Public Sq., Ste. 321
Clarksville, TN 37040

**EDWARD E. DEWERFF (at trial)**
Attorney at Law
103 S. Third St.
Clarksville, TN 37040

FOR THE APPELLEE:

**JOHN KNOX WALKUP**
Attorney General & Reporter

**JANIS L. TURNER**
Counsel for the State
425 Fifth Ave. N., 2d Floor
Nashville, TN 37243-0493

**JOHN W. CARNEY, JR.**
District Attorney General

**ARTHUR BIEBER**
Asst. District Attorney General
204 Franklin St., Ste. 200
Clarksville, TN 37040

OPINION FILED:_____

AFFIRMED

**CURWOOD WITT, JUDGE**

## OPINION

The defendant, Donald Gene Brooks, stands convicted of first degree felony murder,[1] especially aggravated robbery,[2] theft of property valued over $1,000,[3] and setting fire to personal property,[4] all related to the robbery and killing of Joseph J. Wisniewski. He received his convictions following a jury trial in the Montgomery County Criminal Court. Brooks is incarcerated in the Department of Correction serving his effective sentence of life plus 27 years. In this direct appeal, Brooks challenges the sufficiency of the convicting evidence and the length of sentence imposed. Having reviewed the record and the briefs of the parties, we affirm the judgment of the trial court.

At trial, the state's first witness was Floyd Byrd, who testified that he was working as a truck driver on October 28, 1994. That afternoon, he was transporting a load of grain to Hopkinsville Elevator Company. As he traveled on Barge Point Road, he noticed a man lying on the side of the road and saw the man move his head. When he reached Hopkinsville Elevator, he told two employees to call 911.

Robert Kitht was one of the men whom Floyd Byrd told about the victim lying on the side of the road. Kitht jumped in his van and went to the victim, whom he found with a bleeding neck wound. He went to tell his boss to call 911, then returned to try to assist the victim. Kitht tried to apply pressure to stop the bleeding, but discontinued his efforts when the victim began choking. Kitht said this occurred around 4:00 p.m. Kitht recalled telling the investigating authorities that he

---

[1]Tenn. Code Ann. § 39-13-202(2) (Supp. 1994) (amended 1995).

[2]Tenn. Code Ann. § 39-13-403 (1997).

[3]Tenn. Code Ann. § 39-14-103 (1997).

[4]Tenn. Code Ann. § 39-14-303 (a)(1) (1997).

and Jason Brown had seen a car load of people driving erratically that day. At trial, Kitht could not recall how many people were in that car.

Shelly Hogue, a secretary at Hopkinsville Elevator, got off work around 4 p.m. on October 18. She recalled seeing a cream color car speeding up Barge Point Road. A white man with shoulder length, dark hair was in the car.

Dennis Minnick, an emergency medical technician, responded to the scene. When he found the victim, there was nothing he was able to do for Mr. Wisniewski.

Adeline Wisniewski, the victim's wife, left home for work about 8:30 a.m. on the date of her husband's murder. The victim was going grocery shopping and had approximately $200 in cash on his person. The victim owned a light beige 1985 Chrysler New Yorker with a handicap license plate. The car was valued at $3,000 to $3,500.

Edwin Nelson Lunceford, an inmate in the Montgomery County Jail, testified under a conditional grant of immunity from prosecution. Lunceford's immunity was conditioned upon his testifying truthfully, assisting in the investigation of the victim's murder by wearing a "wire" around the defendant, and not having been the person who actually killed the victim.

Lunceford met the defendant at a bar called the Pickle Factory on October 28, 1994. He talked and drank with other patrons, including the defendant, Randy Heardman, Rosemary Devito and the victim. During the afternoon, the victim offered Heardman a ride home. In Lunceford's opinion, the victim was too drunk to drive, and Lunceford convinced the victim to let him drive. The defendant,

3

Heardman, Lunceford and the victim left in the victim's car. After stopping for a twelve-pack of Bud Light and dropping Heardman off at his home, Lunceford, the defendant and the victim stopped on Barge Point Road to relieve themselves. Lunceford, who was driving, got out of the car and relieved himself. When he finished, he turned around and saw the defendant holding the victim by his head with a knife to his throat. The victim's wallet was on the trunk of the car, and the defendant ordered Lunceford to get the wallet. Lunceford admitted he punched the victim in the jaw. He claimed he wanted to knock the victim out so the victim would be unable to identify him. He was concerned about being identified because he was on probation. Lunceford denied, however, that he and the defendant had any prior plan to rob the victim. The defendant cut the victim's throat with a Buck knife.

With the defendant driving, Lunceford and the defendant left the victim on the side of Barge Point Road. They went to "The Cut," where the defendant bought crack cocaine. Then, they went to Ft. Defiance and smoked crack in the woods. After leaving Ft. Defiance, Lunceford and the Defendant went to Cooper Creek, where the defendant threw the knife, the victim's wallet, and some of the wallet's contents by the creek bank. The men inspected the trunk of the victim's car and found four half gallon containers of whiskey, two cartons of cigarettes, a tool box, an air pump, carburetor cleaner, oil, and other contents. The defendant gave Lunceford about $40 from the wallet as they were leaving. Thereafter, they took a ferry to Cumberland City, rode around, drank whiskey and went to Danville Bottoms. Lunceford asked the defendant why he had killed the victim, and the defendant said the victim could not identify them now. The defendant also talked about getting rid of the victim's car.

Some time later, Lunceford and the defendant returned to Clarksville. They went to the home of Connie Gonzalez, the defendant's girlfriend. They parked

4

the victim's car under a breezeway of a church building, Praise Center, near Ms. Gonzalez's home, doused the car in charcoal lighter, and set it on fire. Lunceford and the defendant drank alcohol and smoked crack throughout the night in an upstairs room at Ms. Gonzalez's home. The defendant hid the victim's keys inside a stuffed animal in the room.

Lunceford did not initially report the crimes to law enforcement because he was afraid of the defendant. He claimed the defendant threatened him and his family with harm if he said anything.

Shortly after October 28, the defendant came to Lunceford's home three to four times. He wanted to "work up a story" about the crimes. Lunceford told the defendant that the two needed to say they were not around each other.

Later, after Lunceford came forward, he initiated conversations with the defendant while wearing a "wire" which allowed transmission and tape recording of the conversations. During the first such conversation, the defendant admitted killing the victim; however, the wire did not work. In subsequent conversations, the defendant made statements such as "loose lips sink ships" and "I don't know nothing."

At the time of the defendant's trial, Lunceford was serving time for felony convictions of robbery and forgery, and he admitted to numerous past offenses of driving under the influence, driving on a revoked license, and "simple assaults or domestic disputes." Additionally, he denied talking with David Mitchell, a former cellmate, about the case. He denied having received any money from law enforcement for his assistance in the investigation.

5

Connie Gonzalez, the defendant's girlfriend on October 28, recalled Lunceford and Brooks coming to her home the night of the fire at the church near her house. The men were already in the house when the church started burning. They had come in her back door, which was 30 to 40 yards from the church, and they had beer and two half gallons of whiskey with them. They left and then returned about ten minutes later. They were "happy" and "a little bit" in a hurry. The defendant told Gonzalez that if anyone came looking for him and Lunceford, she should say they had already left. The men spent the night in a room upstairs, where they drank and smoked crack.

Gonzalez recalled having telephoned the Pickle Factory on the afternoon of October 28 and asked the defendant to come to her house. He told her "they" were going to drink a couple more beers, drop Heardman off at his house, and then they would be over. Later, she called Heardman's house, and he told her that "they" had just left and should be at her house at any minute. The defendant and Lunceford arrived an hour and a half to two hours later.

Finally, Gonzalez recalled Brooks and Lunceford first pulling up in the church parking lot behind her house in a car she thought might have been red. When they came back the second time, they did not have the car.

Detective Gary Hodges of the Clarksville Police Department was in the vicinity of Ft. Defiance on October 28. He saw a large cream or white vehicle occupied by two white males. The car had a handicap license tag.

Detective Alan Charvis of the Clarksville Police Department was assigned to investigate the victim's homicide. He had no suspect until another officer, Marty Watson, brought Edwin Lunceford to him in April 1995. Lunceford

6

demanded immunity from prosecution and the presence of a representative of the district attorney general's office as prerequisites to making a statement. After the conditional immunity was granted, Lunceford led Charvis first to Danville Bottoms, where nothing was found. Later, Lunceford told Charvis that the location where the knife, victim's wallet and wallet contents had been discarded was Cooper Creek. Nothing was found at Cooper Creek; however, there had been high waters since the victim's killing in October. Lunceford also told Charvis about a tool box taken from the victim's car, which Lunceford had taken home and enlisted the help of a neighbor in pawning. Charvis recovered the tool box from the pawn shop. Lunceford also gave Charvis information which led to the discovery of Connie Gonzalez and Gary Heardman, both of whom were interviewed.

Lunceford agreed to wear a wire around the defendant. Charvis played portions of three of the taped conversations from the wire for the jury.[5] In them, the defendant variously denies having killed the victim and knowing anything about the crime. Some of his protestations of ignorance are accompanied by laughter. At one point, Lunceford says he is just as guilty as the defendant and that the defendant is in denial. The defendant repeats, "I'm in denial," and laughs. At another point, following Lunceford's profession of concern because his probation officer has been by his house to notify him that the police want to talk to him about the victim's murder, the defendant reassures Lunceford that there is nothing to

---

[5]At trial, only portions of the tapes were played. The entire tapes have been preserved in the record. However, we have not been provided with any indication of which portions of the tapes were played, other than some oblique references via the testimony of Detective Charvis. The court has reviewed the entirety of the tapes in order to identify those portions to which Detective Charvis referred in his testimony. In the future, parties whose evidence contains excerpted portions of audio or video recordings may wish to make some provision for appellate review of only that portion of the recording heard or viewed by the jury.

7

worry about and he should simply follow a plan they talked about the previous day.[6]

Charvis also testified that the call for assistance for the victim at Barge Point Road came at 4:16 p.m., and the call for the fire at Praise Center came at 7:48 p.m.

Lorena Parr, an employee of The Money Tree pawn shop, verified that a tool box pawned on December 22, 1994 was later recovered by Detective Charvis. The identity of the person who pawned the tool box was consistent with the information Lunceford gave Detective Charvis.

Detective Scott Cutler of the Clarksville Police Department assisted in processing evidence at Barge Point Road. Two beer cans were recovered at this scene. The photographic exhibits offered in conjunction with Detective Cutler's testimony show two Bud Light cans.

Doctor Charles Harlan, assistant county medical examiner and consulting forensic pathologist for Montgomery County, conducted an autopsy of the victim. Among the victim's injuries was a 6.60 inch incision of the neck and trachea, which caused the victim's death as he lost blood and his lungs filled with blood. Doctor Harlan estimated that the victim's death occurred between 5 and 15 minutes after the incision was inflicted. He opined that the incision was consistent with one made with a Buck knife. The victim also had bilateral fractures of the mandible, or jaw bone, and lacerations to the lips, which were inflicted at or near the time of death. The mandible fractures were consistent with the victim having been struck

---

[6]It appears the defendant was suspicious of Lunceford. On one of the tapes, the defendant is heard asking Lunceford to raise his shirt and turn around. Lunceford testified the defendant searched him but failed to discover the wire.

8

with a fist.

Special Agent Hoyt Phillips of the Tennessee Bureau of Investigation processed the Bud Light cans for latent fingerprints and determined that the prints obtained from the cans matched an existing record of the defendant's fingerprints.

Special Agent Anthony Clark of the Tennessee Bureau of Investigation, formerly of the Clarksville Police Department, searched Connie Gonzalez's home with other officers. They discovered a Spuds McKenzie stuffed animal which had been torn or cut. A key ring and keys belonging to the victim were found inside the stuffed animal.

Mike Nelson, a convicted felon incarcerated in the Department of Correction,[7] testified he was in the Montgomery County Jail on June 7, 1996. He and the defendant shared a cell. The defendant told Nelson he might be going to prison because he had killed a man. The defendant said he had cut the victim's throat while another man held the victim. The defendant and his companion took the victim's car, and later they burned it at a church. They stashed the victim's car keys in a stuffed animal at a girl's house. Nelson also testified that the defendant told him the only evidence against the defendant was his companion at the time of the crime. He identified this man as "Tony" or "Eddie" or something similar. The defendant said "Tony" or "Eddie" had been wired by law enforcement, so the defendant had not talked to him about the crime. The defendant wished he had killed his companion, as well.

---

[7]Nelson admitted convictions of larceny from a person, grand larceny and escape. At the time of his testimony, he was facing breach of trust charges for failing to return to the Nashville Community Service Center after having made parole.

9

In support of his defense, Brooks presented the testimony of Melissa Ann Springfield Conner. She testified that she had gotten to know Edwin Lunceford about a year and a half earlier.[8] Lunceford told the witness and two of her co-workers that he was involved in a murder trial. The police wired him and gave him money and drugs to go into a bar, where he was to "party" with a man and get him sufficiently "messed up" to confess. Lunceford said the other person had committed the crimes, and he had only gone along with him. Specifically, Lunceford told the witness that the other man had cut the victim's throat. He also admitted that they had burned a car at a church. The witness believed there was more to the story than Lunceford told her.

Jason Brown, an employee of Hopkinsville Elevator Company, recalled that shortly before the victim was discovered on Barge Point Road he had seen an older model, light, yellowish car come down the hill, turn around, and go back up the hill "kind of fast." There were more than two people in the car, but he could not say how many.

Debbie O'Bryan, a former bartender and manager of the Pickle Factory, recalled the defendant, Lunceford, the victim and others being at the Pickle Factory on October 28. However, she did not recall Heardman being there that day. Lunceford was in and out all day. The defendant left at times, but was never gone for more than 5 to 10 minutes. O'Bryan left around 2:00 p.m. to get cigarettes and chewing gum for the bar. She was gone approximately 45 minutes. The defendant was at the bar when she left and was there when she returned. O'Bryan conceded it was difficult to separate the events of one day from those of another as far back as the day of the victim's death.

---

[8]The trial took place in August 1996.

10

Fred Lunceford, Edwin Lunceford's brother, recalled a conversation he had with his brother about the victim's death. Edwin Lunceford told Fred Lunceford that he and the defendant had taken a man out to Barge Point Road. The defendant had gotten the man around the neck and held a knife on him. The defendant instructed Edwin Lunceford to get the man's wallet, and Lunceford complied. Edwin Lunceford hit the man twice because he thought that the defendant would not kill the man if he was unconscious. Edwin Lunceford told his brother that a woman had been with them at the time of the murder. After the murder, they took the victim's car to town and burned it.

Dorothy Suggs was a part time employee of the Pickle Factory on October 28, 1994. She did not learn of the victim's death until a long time afterwards. When she heard of it, she asked Debbie O'Bryan whether the death occurred the same day that Suggs sat at a table with the victim and others at the Pickle Factory, which O'Bryan confirmed. On that day, the victim bought beers for a large group of people, including the defendant and Lunceford. At some point, the victim expressed his desire to go to another bar. A patron nicknamed "Boston Rick" picked up the victim's keys and said he would take the victim. Lunceford said he would go as well, and the three men left. A female patron may have accompanied the men. The witness admitted that she and the defendant are good friends, and the defendant has spent the night in her home when he has been too drunk to go home.

Robert Lyle, a convicted felon awaiting transfer from the Montgomery County Jail to the Department of Correction,[9] testified that he had talked to

_____

[9]Lyle admitted past convictions of worthless checks, theft of property, third degree burglary, grand larceny, larceny, and receiving stolen property. Additionally, he had violated his parole and had an additional federal conviction for mail fraud.

Lunceford in jail. Lunceford told conflicting versions of the crimes, although the defendant was involved in some degree in both versions. Lyle also talked to the defendant in jail and admonished him not to show his "paperwork" to other inmates.

Johnathan Mitchell, a pre-trial detainee in the Montgomery County Jail, was Lunceford's cellmate for ten months. Lunceford told Mitchell about the defendant's case. Later, Mitchell overheard Lunceford talking to another inmate about the crime. The story Lunceford told this inmate was different from the one he told Mitchell. Lunceford was consistent in his admission that he had broken the victim's jaw and his claim the defendant had cut the victim's throat.

Lieutenant Douglas Tackett testified he had known Michael Nelson for about fifteen years and did not believe him to be truthful.

In rebuttal, the state recalled Agent Clark, who claimed that Debbie O'Bryan told him nothing during his interview of her about what happened at the Pickle Factory on October 28, 1994.

On this evidence, the jury found the defendant guilty of first degree felony murder, especially aggravated robbery, theft of property valued over $1,000, and setting fire to personal property.

I

In his first issue, the defendant challenges the sufficiency of the convicting evidence. Specifically, he claims the evidence via the testimony of Edwin Lunceford is incredible. When an accused challenges the sufficiency of the evidence, an appellate court's standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact

12

could have found the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 324, 99 S. Ct. 2781, 2791-92 (1979); State v. Duncan, 698 S.W.2d 63, 67 (Tenn. 1985); Tenn. R. App. P. 13(e). This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. State v. Dykes, 803 S.W.2d 250, 253 (Tenn. Crim. App. 1990).

In determining the sufficiency of the evidence, this court should not reweigh or reevaluate the evidence. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Nor may this court substitute its inferences for those drawn by the trier of fact from the evidence. Liakas v. State, 199 Tenn. 298, 305, 286 S.W.2d 856, 859 (1956); Farmer v. State, 574 S.W.2d 49, 51 (Tenn. Crim. App. 1978). On the contrary, this court must afford the State of Tennessee the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. Cabbage, 571 S.W.2d at 835.

The defendant challenges Lunceford's credibility, and the record reflects that defense counsel ably and vigorously cross-examined Lunceford and assailed his credibility through other witnesses. Additionally, the state's evidence at trial supported its theory of the defendant's guilt of each of the four crimes of which he was ultimately convicted, although the defendant brought forward some evidence of an alibi. Thus, the jury had before it evidence which would allow it, on one hand, to convict the defendant, or on the other, to acquit him. The decision was one which hinged on the jury's assessment of the credibility of the witnesses, particularly Edwin Lunceford, and the weight and value which should be afforded

13

the evidence. The decision was wholly one for the jury to make as trier of fact. Unfortunately for the defendant, the jury's discharge of its function resulted in accreditation of Lunceford's testimony and weighing and evaluating the state's evidence over that brought forward by the defense. Clearly, a rational trier of fact, such as the jury at the defendant's trial, could find the defendant guilty beyond a reasonable doubt of each of the four crimes on the evidence presented.

## II

The defendant's second issue challenges the length of the sentence imposed by the trial court. The sentences are life for first degree felony murder, 25 years for especially aggravated robbery, four years for theft of property, and two years for setting fire to personal property. The court ordered the murder, robbery and setting fire convictions to be served consecutively and the theft conviction to be served concurrently. The effective sentence is life plus 27 years.

The defendant's precise appellate issue alleges, "The sentence given to Defendant/Appellant was excessive because said crimes should merge into a single conviction." The state defends the defendant's sentence by arguing that the defendant is an appropriate candidate for consecutive sentencing. First, we find the defendant's crimes should not be merged, and second, we are unable to review the issue of consecutive sentencing due to deficiency of the record.

The defendant's argument is that all of his acts which constitute the four crimes of which he stands convicted occurred as part of a single course of conduct. The theft, robbery and murder all occurred simultaneously, while the burning of personal property took place a few hours later as a means of destroying evidence of the earlier crimes. As part of a continuous course of conduct, the defendant contends, the issues "are so closely associated in both fact and legal

14

detail that all counts should merge into a single conviction." At another point in his brief, he limits his merger argument to merger "for sentencing purposes."

In support of these novel arguments, Brooks cites Nelson v. State, 208 Tenn. 179, 344 S.W.2d 540 (1960), State v. Banes, 874 S.W.2d 73 (Tenn. Crim. App. 1993) and State v. Bilbrey, 816 S.W.2d 71 (Tenn. Crim. App. 1991). We disagree that the cases relied on by the defendant mandate the result he seeks, whether it is true merger of his convictions or "merger for sentencing purposes."

In Nelson, officers of a labor union were prosecuted for fraudulent breach of trust based upon their ongoing scheme to "reimburse" themselves with union funds for "expenses" incurred in pursuit of union business which they had not actually incurred. Nelson, 208 Tenn. at 180-82, 344 S.W.2d at 541-42. The supreme court held that the officers' conviction of fraudulent breach of trust based upon an ongoing scheme to cash checks signed by both officers and drawn on the union's funds was proper, as opposed to separate larceny convictions for each check. Nelson, 208 Tenn. at 182-87, 344 S.W.2d at 542-44.

In Banes, the defendant was indicted with aggravated rape and the lesser included offense of aggravated sexual battery. Banes, 874 S.W.2d at 76. At trial, the court allowed the jury to consider both issues and report a verdict on both offenses, rather than submitting aggravated sexual battery as a lesser included offense to be considered only if the jury found the defendant not guilty of aggravated rape. Banes, 874 S.W.2d at 76. The jury returned a guilty verdict of both offenses, even though such a verdict was possible only if the same facts were used to support both offenses. Banes, 874 S.W.2d at 77. In other words, there were not two separate sexual acts supporting verdicts on both crimes. On appeal, this court held that the defendant could only be convicted of one crime, and the

15

lesser offense merged into the greater offense. <u>Banes</u>, 874 S.W.2d at 79-81.

In <u>Bilbrey</u>, the defendant was indicted on 22 counts of fraudulent breach of trust based upon a scheme he devised in his employment as a truck dispatcher whereby he used money which came into his possession by virtue of his position for his own use, rather than accounting to his employer for it. <u>Bilbrey</u>, 816 S.W.2d at 73. Each count of the indictment covered one month of this activity. <u>Bilbrey</u>, 816 S.W.2d at 74. He entered nolo contendere pleas to five counts of fraudulent breach of trust, and the court imposed consecutive sentences. <u>Bilbrey</u>, 816 S.W.2d at 74. On appeal, he argued that <u>Nelson</u> required merger of four of the convictions into the one remaining conviction because his criminal activity constituted a single larcenous scheme, rather than separate takings. <u>Bilbrey</u>, 816 S.W.2d at 75. This court held that the defendant waived appellate consideration of the propriety of separate convictions by virtue of his plea agreement, in which he did not reserve the question for appellate review. <u>Bilbrey</u>, 816 S.W.2d at 75-76.

We find no support for the defendant's argument in these cases. First, none of these cases support any argument that the defendant's convictions should be merged into one conviction. In contrast to <u>Banes</u>, Brooks has not been convicted of both lesser included and greater offenses based upon the same set of facts. Brooks committed four separate crimes, each having elemental differences with each other. None of the crimes is a statutory lesser included offense of any other. <u>See generally</u> <u>State v. Trusty</u>, 919 S.W.2d 305 (Tenn. 1996). Likewise, <u>Nelson</u> is not instructive. Unlike the <u>Nelson</u> defendants, Brooks's convictions do not stem from an ongoing scheme to repeat the same act on different occasions, thereby warranting a conviction of a continuous conduct crime, rather than separate but similar offenses for each act. For the same reason, <u>Bilbrey</u> is inapposite, as well.

16

Moreover, we find no support for the argument the convictions should be "merged for purposes of sentencing." The trial court imposed the murder, robbery and burning of personal property sentences consecutive to each other, and concurrent to the theft sentence. We find no authority which requires a "merger" of convictions for sentencing purposes, that is, a requirement of concurrent sentencing where multiple crimes are committed during a continuing course of criminal conduct.[10] The law allows otherwise in certain situations. See generally Tenn. Code Ann. § 40-35-115 and Sentencing Comm'n Comments (1997).

Although we do not view the defendant's argument as a direct attack on the propriety of consecutive sentencing, the state has concluded otherwise and argues that the defendant's sentence is proper because he has an extensive history of criminal activity, is a dangerous offender, and was on probation at the time he committed these offenses. See generally Tenn. Code Ann. § 40-35-115(b)(2), (4), (6) (1997). We express no view in that regard, as we are unable to review the propriety of the court's imposition of consecutive sentencing on three of the four convictions because the record on appeal does not contain the transcript of the sentencing hearing. Thus, we are unaware of the evidence which was before the trial court when it made its sentencing determination and thereby precluded from appellate review.

_____

[10]Appellate defense counsel, in his representation of another defendant, has previously raised this issue in this court. See State v. Franklin, 919 S.W.2d 362 (Tenn. Crim. App. 1995). In Franklin, we found the defendant, who pleaded guilty without reserving a certified question, had waived consideration of whether his multiple forgery offenses should be merged into a single offense based upon his alleged continuing motivation to support his drug habit. However, on the issue of whether separate convictions merge for sentencing purposes, we commented that a defendant who receives a number of convictions will receive a like number of sentences. "Although those . . . sentences may run concurrently, in no sense do they 'merge for sentencing purposes.'" Franklin, 919 S.W.2d at 368.

Therefore, the judgment of the trial court is affirmed.

_____
CURWOOD WITT, JUDGE

CONCUR:

_____
GARY R. WADE, JUDGE

_____
WILLIAM M. BARKER, JUDGE