# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs March 1, 2005

## STATE OF TENNESSEE v. DANIEL BLAKE

**Appeal from the Criminal Court for Shelby County**
**No. 03-05946     Chris Craft, Judge**

---

**No. W2004-01253-CCA-R3-CD  - Filed June 21, 2005**

---

The defendant, Daniel Blake, stands convicted of aggravated vehicular homicide, attempt to leave the scene of an accident, and driving on a revoked or suspended license, and he is serving an effective sentence of 25 years.  He has appealed his aggravated vehicular homicide conviction and claims that the state failed to prove beyond a reasonable doubt that his blood-alcohol content was above .20 percent and that he had previously been convicted of DUI.  After thoroughly reviewing the record and applicable authorities, we find sufficient evidence to support the conviction and affirm the judgment.

**Tenn. R. App. P. 3; Judgment of the Criminal Court is Affirmed.**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which THOMAS T. WOODALL and J.C. MCLIN, JJ., joined.

Robert Wilson Jones, District Public Defender; and Trent Hall and W. Mark Ward, Assistant District Public Defenders, for the Appellant, Daniel Blake.

Paul G. Summers, Attorney General & Reporter; Michael Markham, Assistant Attorney General; William L. Gibbons, District Attorney General; and Alanda Dwyer and Michelle Parks, Assistant District Attorneys General, for the Appellee, State of Tennessee.

## OPINION

Roadway Express Company has a terminal located in Memphis near the intersection of Neely Road and Winchester/Mitchell Road.  Ingress and egress to the terminal are controlled, and all traffic must clear a security booth with a draw gate.  Robert Moore was in charge of the security booth on October 22, 2002.  Early that morning, at approximately 5:00 a.m., Mr. Moore exchanged pleasantries with the victim, Jessie Collier.  Mr. Collier worked for Roadway Express as the "clean up" employee, and as part of his normal routine, Mr. Collier would clean up around the trash containers in front of the security booth.

Mr. Moore testified that Mr. Collier passed by the booth with his clean-up cart. Mr. Moore was watching the terminal parking lot with his back toward Mr. Collier. Mr. Moore said that he "heard a vehicle coming in at a rather high speed[,] and [he] felt a crash[,] and [he] heard a crash and felt it." When Mr. Moore turned toward the source of the crash, he saw that a sport utility vehicle (SUV) had crashed into the trash bins. Mr. Moore ran to the vehicle and saw that Mr. Collier was pinned between the SUV and the trash bins. Mr. Collier appeared to be in pain and was beating on the trash bins. Mr. Moore called E-911 to summon help.

Mr. Moore identified the defendant as the driver of the SUV and described him as a "bit hysterical" and "pretty dazed." According to Mr. Moore, the defendant placed the SUV in reverse, freeing Mr. Collier's body. The defendant then drove into the terminal parking lot through the outbound side of the security booth, turned around in the parking lot, and attempted to leave. To stop the defendant, Mr. Moore placed a spike strip on the ground, and the defendant blew out his tires as he drove over it. Even so, the defendant had to be forced to stop the vehicle, and when the defendant finally exited his SUV, Mr. Moore testified that the defendant "just stagger[ed] around the parking lot . . . mumbling . . . out of his head . . . drunk."

Mr. Collier was transported by ambulance to a local trauma center; his injuries proved fatal, and he died sometime after 6:00 a.m. that morning. Teresa Campbell, the Shelby County Assistant Medical Examiner, performed the autopsy of Mr. Collier. She testified and itemized the multiple injuries to Mr. Collier's chest, abdomen, and extremities that led to his death.

Two eyewitnesses who worked as drivers for Roadway Express testified at trial. Kenneth Bradley and Jeff Sword were returning to the terminal in a truck at approximately 5:00 a.m. Mr. Bradley, who was driving the truck, testified that as he was preparing to make a left turn into the terminal, he saw the defendant's Ford Explorer run through a stop sign and crash through barriers protecting the guard shack. When Mr. Bradley pulled his truck into the yard, he saw that a person was pinned between the Explorer and the garbage cans outside the guard booth. Mr. Bradley explained that the garbage cans sat in an elevated metal cage so that the incoming truck drivers could empty their trash before entering the terminal.

The defendant backed his Explorer into Mr. Bradley's truck, and Mr. Bradley saw the person who had been pinned fall. Mr. Bradley went to assist the victim, and the defendant then drove into the yard. The defendant's escape from the terminal was thwarted by Mr. Moore, who laid out a spike strip, and by another employee, who broke out the glass on the driver's side window, snatched away the ignition keys, and physically subdued the defendant. Mr. Bradley explained that his attention was primarily focused on the victim, not the defendant. Mr. Bradley was never close enough to the defendant to detect any odor of alcohol, but Mr. Bradley did observe the defendant "[s]taggering" with "[h]is eyes . . . half open."

Jeff Sword, who was riding with Mr. Bradley, testified that he also observed the Ford Explorer run the stop sign, cross the intersection, and crash into the guard booth. Mr. Sword explained that the intersection was a controlled four-way stop with flashing lights. He and Mr.

Bradley were stopped in their truck at the intersection, waiting to make a left turn into the terminal when the defendant raced across their line of sight. When Mr. Sword first saw the victim, the victim was facing toward the security booth; the Explorer struck the victim in the back pinning the front of his body against the trash containers.

After the defendant was removed from his vehicle, Mr. Sword observed the defendant "definitely staggering" back in the direction of the parking lot and "having a real difficult [time] standing up." Before that time, Mr. Sword had walked up to the defendant's vehicle to check on the defendant. Mr. Sword testified that the defendant was "woozy," "[d]izzy," and nonresponsive, and Mr. Sword detected the smell of alcohol. After the defendant was arrested and placed in a police automobile, Mr Sword observed that the defendant appeared to be "passed out."

Corey Smith with the Memphis Police Department was the first officer on the scene. Roadway employees pointed out the defendant to Officer Smith. The defendant was sitting on the curb, and Officer Smith testified that the defendant appeared "extremely intoxicated." The defendant smelled of alcohol, his eyes were watery, and he was nonresponsive to questioning. Roadway employees had to help the officer carry the defendant to the police cruiser. Officer Smith secured the defendant's wallet to obtain identification, and the defendant's date of birth was recorded as July 29, 1969. A check on the status of the defendant's driver's license revealed that it had been revoked. Diane Joyner, a supervisor for the Memphis reinstatement office of the Department of Safety testified and confirmed that as of October 22, 2002, the defendant's privilege to drive had been revoked.

After the defendant's arrest at the Roadway premises, a warrant was issued to collect blood from the defendant. Nurse Practitioner Nina Sublette testified that she was on duty at the Shelby County Regional Medical Center on October 22 when the defendant was transported to inmate holding at the medical center. Ms. Sublette photographed the defendant, took his thumb print, and drew his blood according to hospital "protocol for blood draw." Ms. Sublette collected the defendant's blood at 10:50 a.m. She placed her initials, the defendant's name, and the date and time on the blood vials, and she gave the blood samples to the metro officer who was present. Ms. Sublette observed while the officer wrapped the vials in bubble wrap, placed them in a box, and sealed the box. Ms. Sublette explained that she then photographed all four sides of the box "to prove that it was sealed when it left [her] possession."

TBI Special Agent Robert Marshall performed a blood alcohol analysis for the ethanol content of the defendant's blood. He testified that the result was 0.21 gram percent of ethyl alcohol content. The state attempted to qualify Agent Marshall as an expert in alcohol metabolism to give an opinion regarding alcohol dissipation rate, but the trial court sustained the defense objection to the agent's qualifications.

At the conclusion of Agent Marshall's testimony, the state rested its case. The defendant did not testify, nor did he call any witnesses. Based on the evidence presented, the jury found the defendant guilty of vehicular homicide by intoxication, vehicular homicide by reckless conduct, criminal attempt to leave the scene of an accident, and driving on a suspended license.

Because the state had also charged the defendant with Class A felony aggravated vehicular homicide,[1] the jury remained empaneled to hear additional evidence related to that charge. The state called Mike Triplett, the records custodian for the Shelby County General Sessions Clerk's Office. Mr. Triplett maintained records showing that Daniel Blake, with a July 29, 1969 date of birth, pleaded guilty on August 28, 1995 to DUI and driving on a suspended, revoked, or cancelled license. Based on the additional evidence, the jury also found the defendant guilty of aggravated vehicular homicide.

At a separate sentencing hearing, the trial court merged the three homicide convictions into a single conviction for Class A aggravated vehicular homicide. The trial court found and attributed great weight to the defendant's previous history of criminal convictions, *see* Tenn. Code Ann. § 40-35-114(2) (2003), and to his previous history of unwillingness to comply with the conditions of a sentence involving release in the community, *see id*. § 40-35-114(9). The trial court found no mitigating factors. Weighing the enhancement factors, the trial court imposed a sentence of 24 years. *See id*. § 40-35-112(a)(1) (Range I sentence for Class A felony set at 15 to 25 years). Regarding the misdemeanor convictions of driving on a revoked license and criminal attempt to leave the accident scene, the trial court also imposed maximum, six-month sentences. The court ordered the sentences to run consecutively for an effective sentence of 25 years.

Aggrieved of his aggravated vehicular homicide conviction, the defendant has appealed and challenges the sufficiency of the convicting evidence. His argument is two-fold. First, he claims that there was insufficient evidence to establish that at the time of the offense, there was 0.20 percent or more by weight of alcohol in his blood. Second, he maintains that the evidence was legally insufficient to show that he had a prior DUI conviction.

Our evidence-sufficiency review is conducted pursuant to well-settled principles. When an accused challenges the sufficiency of the evidence, an appellate court inspects the evidentiary landscape, including the direct and circumstantial contours, from the vantage point most agreeable to the prosecution. The reviewing court then decides whether the evidence and the inferences that flow therefrom permit any rational fact finder to conclude beyond a reasonable doubt that the defendant is guilty of the charged crime. *See* Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 324, 99 S. Ct. 2781, 2791-92 (1979); *State v. Duncan*, 698 S.W.2d 63, 67 (Tenn. 1985); *State v. Dykes*, 803 S.W.2d 250, 253 (Tenn. Crim. App. 1990), *overruled on other grounds by State v. Hooper*, 29 S.W.3d 1 (Tenn. 2000).

---

[1] As relevant to this case, Code section 39-13-218(a)(3)(A) defines aggravated vehicular homicide in the following terms: "There was at the time of the offense twenty-hundredths of one percent (.20%), or more, by weight of alcohol in the defendant's blood and the defendant has one (1) prior conviction for: (A) Driving under the influence of an intoxicant." Tenn. Code Ann. § 39-13-218(a)(3)(A) (2003). Subsection (c) provides that the "indictment, in a separate count, shall specify, charge and give notice of the required prior conviction or convictions" and that "[i]f the defendant is convicted of vehicular homicide under § 39-13-213(a)(2), the jury shall then separately consider whether the defendant has the requisite number and types of prior offenses and/or level of blood alcohol concentration necessary to constitute the offense of aggravated vehicular homicide." *Id*. § 39-13-218(c).

In determining sufficiency of the proof, the appellate court does not replay and reweigh the evidence. *See State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Witness credibility, the weight and value of the evidence, and factual disputes are entrusted to the finder of fact. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978); *Liakas v. State*, 199 Tenn. 298, 305, 286 S.W.2d 856, 859 (1956); *Farmer v. State*, 574 S.W.2d 49, 51 (Tenn. Crim. App. 1978). Simply stated, the reviewing court will not substitute its judgment for that of the trier of fact. Instead, the court extends to the State of Tennessee the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences that may be drawn from the evidence. *See Cabbage*, 571 S.W.2d at 835.

To convict the defendant of aggravated vehicular homicide in this case, the state was obligated to prove beyond a reasonable doubt that at the time of the offense, there was "twenty-hundredths of one percent (.20%), or more, by weight of alcohol in the defendant's blood" and that he had one prior DUI conviction. *See* Tenn. Code Ann. § 39-13-218(a)(3)(A) (2003). The defendant points out that his blood was not drawn until 10:50 a.m., several hours after the accident, and he argues that the state's evidence is deficient because the state failed to extrapolate the .21 percent test result back to the time of the accident. The defendant cites no authority in support of his argument that the state must offer extrapolation evidence, and we reject any such notion.

"Extrapolation involves the use of scientific evidence to relate the blood alcohol level at the time of testing back to the time of operation of the vehicle." *State v. Greenwood*, 115 S.W.3d 527, 531 (Tenn. Crim. App. 2003), *perm. app. denied* (Tenn. 2003). In *Greenwood*, the court canvassed existing legal authority and articles regarding the reliability of extrapolation evidence and the necessity of such evidence to obtain a conviction for DUI. The court adopted the majority view of not requiring such expert evidence based on several considerations, namely:

> The absorption rate of alcohol depends upon a number of variable factors. To require the state to accurately extrapolate would place an impossible burden on the state. Even if we assume extrapolation evidence can be sufficiently reliable, the necessary variables may not be within the knowledge of the state and are singularly within the knowledge of the defendant; thus, the state will be unable to acquire the necessary information. For example, only the defendant may know when and how much he or she last ate, as well as when, how much, and how fast he or she last consumed alcohol. In short, the necessary extrapolation evidence could only be obtained with reliable information furnished by the defendant.

*Id*. at 532 (citation omitted).

The *Greenwood* court, however, was careful to point out that nothing "preclude[d] a defendant from introducing evidence and proper expert testimony relating to whether the alcohol content in his or her blood was rising or falling" and that "evidence of the defendant's physical

condition at the time of arrest or at the time of administration of the test is relevant to the issue of blood alcohol content." *Id*. Likewise, the court emphasized, "[A] proper blood alcohol test administered at a reasonable time after the defendant has been driving, . . . constitutes circumstantial evidence upon which the trier of fact may, but is not required to, convict the defendant." *Id*. at 532-33. The court added, "Any delay between driving and testing may be considered by the trier of fact as to the weight to be given the test." *Id*. at 533.

In our opinion, *Greenwood* disposes of this issue. Nothing in the record suggests that the blood alcohol testing was anything other than reliable and accurate. The defendant could have, but did not, offer his own expert testimony of extrapolation. The jury was certainly entitled to credit the 0.21 percent blood alcohol test result as circumstantial evidence supporting a conviction of aggravated vehicular homicide based on 0.20 percent, or more, by weight of alcohol in the defendant's blood at the time of the offense. Accordingly, the defendant's conviction is not infirm on that basis.

The defendant's second attack on the sufficiency of the convicting evidence is that the testimony of the records custodian for the general sessions court was insufficient to prove that the defendant was the same person who pleaded guilty to DUI on August 28, 1995. The defendant relies on *State v. Robert Williams*, No. 03C01-9302-CR-00050 (Tenn. Crim. App., Knoxville, Apr. 2, 1996), as support for this contention. *Robert Williams*, however, is clearly distinguishable. In that case, the court set aside a death sentence[2] because the evidence was insufficient to show that the defendant was the same person convicted in other cases that the state introduced as the defendant's previous convictions; for its proof, the state had attempted to show identity based only on records containing the same name as the defendant Robert Williams. In the instant case, the state offered evidence showing that an individual with both the same name and date of birth as the defendant pleaded guilty to the requisite prior DUI. That evidence, we hold, properly permitted the jury to conclude that the individuals were one and the same.

Finding the evidence sufficient to sustain the defendant's conviction for aggravated vehicular homicide, we affirm the trial court's judgment.

_____
JAMES CURWOOD WITT, JR., JUDGE

_____

[2] On May 17, 1996, the court granted the state's petition to rehear and ordered that the case be remanded for resentencing.