# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs December 18, 2001

## STATE OF TENNESSEE v. ANDREW B. SIMPKINS

**Direct Appeal from the Circuit Court for Montgomery County**
**No. 40631     John H. Gasaway, III, Judge**

---

### No. M2001-01737-CCA-R3-CD - Filed August 15, 2002

---

A Montgomery County jury convicted the Defendant of one count of criminal attempt to commit first degree murder and one count of possession of a prohibited weapon. The Defendant now appeals, asserting that the evidence was insufficient to support his convictions. After reviewing the record, we find no error and thus affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which JOSEPH M. TIPTON and THOMAS T. WOODALL, JJ., joined.

Jeffry S. Grimes, Clarksville, Tennessee, for the Appellant, Andrew B. Simpkins.

Paul G. Summers, Attorney General and Reporter; Renee W. Turner, Assistant Attorney General; John W. Carney, Jr., District Attorney General; and Helen O. Young, Assistant District Attorney General, for the Appellee, State of Tennessee.

### OPINION

The Montgomery County Grand Jury indicted the Defendant, Andrew Simpkins, for one count of criminal attempt to commit first degree murder and for one count of possession of a prohibited weapon. Following a jury trial, the Defendant was convicted on both counts in the indictment. The trial court sentenced the Defendant to twenty-five years for the criminal attempt to commit first degree murder conviction and to two years for the possession of a prohibited weapon conviction. The court ordered that the sentences be served concurrently. The Defendant subsequently filed a motion for new trial, which the trial court denied. On appeal, the Defendant now challenges the sufficiency of the convicting evidence. We conclude that the evidence is sufficient to support the convictions and affirm the judgments of the trial court.

## I. FACTS

The Defendant, an infantry soldier in the United States Army, met his girlfriend, Genevieve Soler, at a fair in June 1998. In July, the two began dating. Shortly thereafter, Soler told the Defendant that her ex-boyfriend, Jesse Lopez, along with two of his friends, had raped her at a party. Soler told the Defendant that she was intoxicated and did not remember much of the alleged rape. Over the next few months, the Defendant talked with Soler and several others about the rape and his plans to exact revenge on the alleged rapists.

Soler testified that after she told the Defendant about being raped by Lopez, the Defendant talked about the rape almost every day and repeatedly talked about hurting or "taking care" of Lopez. The Defendant also asked Soler where Lopez lived.

Janet Hern, a close friend of Soler, testified that shortly after the Defendant and Soler began dating, the Defendant started asking her questions about Lopez, including how he got home from school and if she knew when he would be home alone. The Defendant told Hern to get Lopez outside, and he would "take care of the rest." Hern claimed that the Defendant called her so often to discuss Lopez that she began avoiding his calls. The Defendant told Hern that Lopez "should not live" for raping his girlfriend.

Joshua Caleb Sisson, the Defendant's roommate at Fort Campbell from 1998 to 1999, testified that during a road trip to Memphis, the Defendant told Sisson that his girlfriend had been raped by her ex-boyfriend. The Defendant appeared angry and disgusted and said that people who raped other people should be killed. Throughout the trip, the Defendant continued to talk about the rape.

Elan Banks, a former roommate of the Defendant, testified that the Defendant talked about the alleged rape every day and told Banks that he planned to kill the men who raped Soler. On several occasions, the Defendant told Banks that he planned to go to Lopez's home, ring the doorbell, and shoot. The Defendant asked Banks to help him get a gun so that he could shoot the alleged rapists. He also asked Banks to ride by Lopez's house with him.

On January 15, 1999, four days before Lopez was shot, the Defendant purchased a 12-gauge shotgun at Wal-Mart. The sales associate at Wal-Mart completed a firearms transaction report for a New England Farms Model SB1-101 shotgun. The associate obtained purchase approval through the Tennessee Bureau of Investigation (TBI) instant check at 4:57 p.m. The serial number for the Defendant's gun was NM363294.

The Defendant then went to a nearby retail store, Grandpa's, to purchase shells for the shotgun. A systems analyst at Grandpa's was able to match a receipt recovered during the investigation with the date and item purchased. The receipt indicated that 12-gauge game load, number six bird shot, was purchased on January 15, 1999 at 5:28 p.m. The analyst testified that Grandpa's is located down the street from the Wal-Mart store where the Defendant purchased the gun. She also testified that Grandpa's is an Ace Hardware dealer and uses Ace Hardware sacks.

Two days later, two of the Defendant's friends, Elliott Tso and Kee Blackwater, visited the Defendant's room. At that time, they saw the Defendant sawing on a shotgun. Blackwater heard the Defendant ask Tso to help him stake out Lopez's house.

The day before the shooting, the Defendant displayed a sawed-off shotgun to at least two people. Soler testified that the Defendant produced a short, black shotgun and said he intended to go to Lopez's house and scare him with it. Banks testified that, while riding in the Defendant's car, the Defendant pulled a sawed-off shotgun from under the seat and placed it in Banks' lap.

On January 19, 1999, the day of the shooting, the Defendant finished work around 4:30 p.m. Afterwards, he was required to attend a "GI Party," which is essentially a cleaning session at the barracks. Around 6:00 p.m., Soler talked with the Defendant on the phone. The Defendant asked Soler to call Lopez's house to see if he was home. While talking to the Defendant, Soler heard him tell his superiors that he had to leave the GI party to take Soler to the hospital, although Soler did not actually need to go to the hospital. Because Soler was unwilling to call Lopez herself, she asked her friend, Johanna Paschall, to make the call. Paschall called Lopez and asked for "Rick." She then called Soler and said that she made the call, but did not know who answered the phone. Soler called the Defendant and told him that Lopez was not home, but that his parents were.

Jesse Lopez recalled receiving a phone call around 7:00 p.m. the night of the shooting. Lopez testified that the caller asked for someone who did not live at the Lopez residence. Less than half an hour later, at 7:22 p.m., the doorbell rang at the Lopez's house. Expecting a visit from his friend, Michael, Lopez ran past his mother to answer the door. As he opened the door, he was shot in the face. Lopez did not see who was at the door and did not remember being shot.

Around 8:00 p.m., Soler and the Defendant met at Paschall's house. Soler later told detectives that the Defendant was acting strangely. She reported that he was unusually quiet and asked Soler to hug him.

After meeting with Soler, the Defendant returned to the barracks to see Elliott Tso. Tso testified that the Defendant arrived around 10:00 p.m. The Defendant told Tso, "I got one." He said that he knocked on the door, shot the first person that answered, and ran. The Defendant told Tso that the person he shot was Lopez. He asked Tso if he would take the gun, but Tso refused. The Defendant then told Tso that he had put the shotgun shells in the back of Tso's truck. Tso found and removed the shells from an Ace Hardware sack. Tso testified that he and the Defendant were close friends and that he was unsure of what to do. Tso decided to turn the shells over to detectives and to allow them to search his truck.

Investigators testified that they interviewed the Defendant the day after the shooting. Initially, the Defendant told detectives that he did not own a shotgun. He also said that during the time the shooting occurred, he had gone to a shoppette on the Kentucky side of the Fort Campbell post to purchase a sandwich, chips, a snack cake, and a drink. After reviewing the sales receipts

3

from this particular shoppette, detectives were unable to corroborate the Defendant's purchases. They also became aware of his gun purchase. In a second interview, the Defendant admitted to purchasing the shotgun, but claimed it was stolen from his car on the same day it was purchased. The Defendant did not report the gun stolen. During this interview, the Defendant maintained that he had gone to the shoppette at the time of the shooting.

The Clarksville Police Department, along with investigators from the United States Army Criminal Investigation Command (CID), conducted a search of the barracks and the surrounding areas. Underneath a military conics, a steel storage container resembling a dumpster, located twenty-three to thirty feet from the building in which the Defendant lived, investigators found a bag containing a shotgun. The gun had been wrapped in felt similar to that found in a military-issue blanket. The shotgun was a New England Farms firearm 12-gauge, the same type the Defendant purchased at Wal-Mart only days before the shooting, with a partial serial number of NM 36. The remainder of the serial number had been destroyed. However, the TBI was able to restore seven of the eight digits of the serial number on the shotgun. With the exception of the single missing digit, the restored number matched the serial number on the Defendant's shotgun. Inside the Defendant's room, investigators found a notepad with the names of the three alleged rapists. Lopez's phone number was written beside his name. From Elliott Tso's truck, detectives recovered a plastic Ace Hardware sack, similar to those used at Grandpa's, containing the receipt for shotgun shells purchased at Grandpa's. They also discovered a silver hacksaw similar to the one Tso and Blackwater saw the Defendant using to saw on the shotgun. Tso led investigators to the actual shells that the Defendant left in his truck. The TBI concluded that shot and wadding recovered from the crime scene was consistent with the size and weight specification of the shells recovered from Elliott Tso's truck.

While incarcerated, the Defendant told another inmate, Kenneth Buckler, about the shooting. According to Buckler, the Defendant claimed that he shot someone in the face because the victim and some other people had raped the Defendant's girlfriend. The Defendant told Buckler that he was angry, that he had planned the shooting, and that he had staked out the victim. He said that he had sawed off a shotgun, gone to the victim's home, knocked on the door, and shot as soon as the victim answered. The Defendant told Buckler that he cleaned off the gun, wrapped it in a poncho liner, and placed it under the barracks.

## II. ANALYSIS

The Defendant claims that insufficient evidence was presented at trial to convict him of criminal attempt to commit first degree murder and of possession of a prohibited weapon. When an accused challenges the sufficiency of the evidence, an appellate court's standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); Jackson v. Virginia, 443 U.S. 307, 324 (1979); State v. Duncan, 698 S.W.2d 63, 67 (Tenn. 1985). This rule applies to findings of guilt based upon direct evidence, circumstantial

evidence, or a combination of both direct and circumstantial evidence. <u>State v. Pendergrass</u>, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999).

In determining the sufficiency of the evidence, this Court should not re-weigh or re-evaluate the evidence. <u>State v. Matthews</u>, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. <u>State v. Buggs</u>, 995 S.W.2d 102, 105 (Tenn. 1999); <u>Liakas v. State</u>, 286 S.W.2d 856, 859 (Tenn. 1956). Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. <u>Liakas</u>, 286 S.W.2d at 859. This Court must afford the State of Tennessee the strongest legitimate view of the evidence contained in the record, as well as all reasonable inferences which may be drawn from the evidence. <u>State v. Evans</u>, 838 S.W.2d 185, 191 (Tenn. 1992). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. <u>Id.</u>

The Defendant first argues that insufficient evidence was presented to support his conviction for attempted first degree murder. In order to convict the Defendant of attempted first degree murder, the State was required to prove that the Defendant, acting with the kind of culpability otherwise required for this offense, acted "with intent to cause a result that is an element of the offense, and believe[d] the conduct [would] cause the result without further conduct on the person's part," Tenn. Code Ann. § 39-12-101(a)(2), and that the result intended was the "premeditated and intentional killing of another." <u>Id.</u> § 39-13-202(a)(1).

Viewing the evidence in the light most favorable to the State, the evidence showed that the Defendant repeatedly stated his intention to hurt or kill Lopez. In fact, he described to friends the exact method he would employ: He would go to the front door, knock or ring the doorbell, and shoot the first person to answer. The Defendant purchased a shotgun in anticipation of the shooting. He then lied to detectives about owning a gun. After the shooting, the appellant went to a friend's room to report that he "got one."

The State had the burden of proving the element of premeditation. <u>State v. West</u>, 844 S.W.2d 144, 147 (Tenn. 1992). Premeditation necessitates "the exercise of reflection and judgment." Tenn. Code Ann. § 39-13-202(d). "The element of premeditation requires a previously formed design or intent to kill." <u>West</u>, 844 S.W.2d at 147.

The proof set out above indicates that the appellant threatened to hurt or kill the victim several months prior to the shooting. Additionally, the appellant purchased a shotgun four days before the shooting. Two days later, he was seen sawing on the gun. Also, he attempted to remove the serial number used to identify the weapon. Further, the appellant asked two friends to help him stake out the victim's home. Immediately prior to the shooting, the appellant asked his girlfriend to call to see if the victim was home. This evidence clearly supports the mental elements necessary to prove criminal attempt to commit first degree murder.

5

The Defendant next argues that insufficient evidence was presented to support his conviction for possession of a prohibited weapon, defined in pertinent part as follows: "A person commits an offense who intentionally or knowingly possesses . . . [a] short-barrel rifle or shotgun . . . ." Tenn. Code Ann. § 39-17-1302(a)(4). The Defendant claims that although the State proved that he possessed the prohibited weapon, it did not establish that he possessed it in Tennessee. While investigating the shooting of Jesse Lopez, detectives removed shot and wadding from the crime scene that was consistent with the type allegedly purchased by the Defendant days before the shooting. Additionally, several witnesses testified to seeing the Defendant sawing on a shotgun days before. A jury could have reasonably found that the Defendant used the sawed-off shotgun and the recovered shot to shoot the victim. Because the shooting occurred in Tennessee, the evidence is sufficient to establish that the Defendant possessed the prohibited weapon in Tennessee when he used it to shoot the victim.

From this evidence, a rational trier of fact could have found the essential elements of both crimes beyond a reasonable doubt. Accordingly, the judgments of the trial court is AFFIRMED.

_____
ROBERT W. WEDEMEYER, JUDGE

6