**STATE of Tennessee, Appellee,**

v.

**David Carl DUNCAN, Appellant.**

Supreme Court of Tennessee,
at Nashville.

Sept. 9, 1985.

Rehearing Denied Sept. 30, 1985.

Edward M. Yarbrough, J. Russell Heldman (on appeal only), William Norman Ligon, Nashville, (at trial only), for appellant.

Kymberly Lynn Anne Hattaway, Asst. Atty. Gen., W.J. Michael Cody, Atty. Gen. & Reporter, Nashville, of counsel.

## OPINION

COOPER, Chief Justice.

Defendant, David Carl Duncan, appeals his conviction of murder in the first degree and sentence of death, and two consecutive life sentences imposed on convictions for armed robbery and aggravated rape. He questions the sufficiency of the evidence over all, rulings by the trial court on voir dire, the admission of evidence, objections to argument by the state in both the convicting and sentencing phases of the trial, and the court's instructions to the jury. Defendant also insists that the sentencing provision of the Tennessee Death Penalty Act, T.C.A. § 39–2–203, is unconstitutional.

After consideration of the several issues and of the entire record, we are of the opinion that no reversible error was committed in the trial, that the verdicts and sentences are sustained by the evidence, and that the sentence of death under the circumstances of this case is in no way arbitrary or disproportionate. *See State v. Harries,* 657 S.W.2d 414 (Tenn.1983); *State vs. Strouth,* 620 S.W.2d 467 (Tenn.1981), *cert. denied,* 455 U.S. 983, 102 S.Ct. 1491, 71 L.Ed.2d 692; *Houston v. State,* 593 S.W.2d 267 (Tenn.1980), *cert. denied* 449 U.S. 891, 101 S.Ct. 251, 66 L.Ed.2d 117.

Defendant was convicted of raping and killing Ruby Evelyn Burgess in the course of a robbery of the Short Stop Market in Gallatin, Tennessee. Ms. Burgess was employed at the market as the night-shift cashier, with her work assignment being from 10:00 p.m. to 6:00 a.m. On February 15, 1981, her relief reported to the market at approximately 5:40 a.m. She found the

"still-warm," partially nude body of Ms. Burgess in the aisle near the cash register. Ms. Burgess's throat had been cut and she was lying in a pool of blood. Her pants and undergarments were pulled down around her lower right leg. A trail of blood led from the cooler at the back of the store to her body, indicating that the assault took place in the cooler. Time of death was fixed by the examining physician at approximately 5:30 a.m. According to the examining physician, Ms. Burgess's death resulted from three cuts to her neck of such force that they cut through her neck muscles, jugular vein, trachea, larynx and esophagus, and nicked the carotid artery. The immediate cause of death was an air embolus in the heart caused by the entry of air into the blood stream through the gaping wound in Ms. Burgess's neck.

A subsequent examination of Ms. Burgess's body revealed mobile sperm in her vagina from a "type O secretor." The defendant is a "type O secretor," as are approximately thirty-five percent of the male population.

The cash register drawer was closed when Ms. Burgess's body was found, but comparison of the cash register tape with the contents of the register showed that $246.00 was missing. The last item shown on the cash register tape was a 35¢ grocery item. (Prior to it, $3.00 worth of gas and a 25¢ grocery item had been sold.) A bottle of Tropicana fruit punch, which sold for 35¢, was sitting on the counter by the cash register. The bottle still had "frost" on it when the police arrived. Six fingerprints were lifted from the bottle. Four of the prints were later identified as being from defendant's left hand.

Linda Kelly, a local cab driver who had known the defendant three or four years, testified that she saw defendant pumping gas into a dark green Buick Electra at the market at approximately 4:50 a.m. on February 15, 1981. The defendant was wearing a toboggan and a dark jacket and had his hair in plaits.

At approximately 5:30 a.m., Harold Pryor, an employee of the *Nashville Ten-nessean*, was putting newspapers in a rack outside the Short Stop Market, when he saw a young black male, six foot one, approximately one hundred forty-five pounds, wearing a "tam" (or having short hair) and a dark "shawl," come from the direction of the market door and go towards a dark blue or black car parked at the store. The description generally matched that of the defendant, but Pryor did not identify the defendant as the man he had seen.

On the day after the murder, the defendant called the cab company and for the first time ever specifically requested that Ms. Kelly drive him to work in nearby Hendersonville, Tennessee. When the defendant mentioned to Kelly that he had seen her someplace the night before, Kelly reminded him that they had seen one another at the Short Stop Market. The defendant said he had trouble remembering this because "he'd been gettin' out and gettin' high ... that weekend." When Kelly said, "it's bad about that woman, you know, gettin' killed," the defendant's hands began to tremble and he changed the subject. For the next week and a half Kelly drove the defendant to and from work for $14.00 per day. The defendant then told Kelly he was leaving Gallatin to go to a vocational training center in Kentucky or Indiana. The proof showed defendant did join the Job Corps in Kentucky, where he remained until the fall of 1981.

After his return to Gallatin, the murder investigation zeroed in on the defendant. The defendant gave the police two statements to the effect that he had not been near the store at the time of the murder, that he seldom traded there, and that he did not know Ms. Burgess. He said he had never purchased any juice at the store and was allergic to fruit punch. He further stated that he knew of no way he could have touched the bottle the police found on the counter by the cash register, and from which his fingerprints had been lifted.

The defendant's proof consisted of the testimony of friends and family. His girlfriend testified that he had spent the night of the killing at her house and that he had

worked on her automobile the next day. She also testified that the defendant usually drove her orange and white automobile when he needed an automobile. Family members testified that while they owned two dark green automobiles, a Buick and a Nova, the Nova was not "street-worthy" in February, 1981, and the Buick was not purchased until sometime in 1982. The defendant's brother who owned the Nova testified that he had not permitted defendant to drive the car on the night of the murder, nor had he allowed defendant to drive his 1977 dark blue Grand Prix. The defendant did not testify.

From this evidence, the jury found the defendant guilty of first degree murder, aggravated rape, and armed robbery. Life sentences were given on the rape and robbery convictions and, in a separate hearing, the jury returned the sentence of death on the first degree murder conviction. In imposing the sentence of death, the jury found from the evidence introduced in the convicting phase of the trial that the murder of Ruby Evelyn Burgess was especially heinous, atrocious, or cruel in that it involved torture or depravity of mind and that the murder was committed while the defendant was engaged in committing rape and robbery. *See* T.C.A. § 39–2–203(i)(5) and (7). No mitigating circumstances were found by the jury.

 Where the sufficiency of the evidence is challenged, as it is in this case, the relevant question for this court is whether a rational trier of fact could find from the evidence that the essential elements of the crimes for which the defendant stands convicted were proven beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 2782, 61 L.Ed.2d 560 (1979); T.R.A.P. Rule 13(e). In our opinion, the evidence in this case meets the test. There is no question but that the crimes of murder, aggravated rape, and robbery were committed, and the evidence, though circumstantial, points unerringly to the defendant as the person guilty of the crimes. He was placed at the scene near the time the crimes were committed, and his finger-prints were on the "sweating" bottle of Tropicana juice found beside the cash register. A conviction based on circumstantial evidence is proper where the facts are "so clearly interwoven and connected that the finger of guilt is pointed unerringly at the defendant and the defendant alone." *State v. Crawford,* 225 Tenn. 478, 470 S.W.2d 610, 613 (1971). We are also of the opinion that the evidence that the murder of Ruby Evelyn Burgess occurred in the course of the rape and robbery, and the fact that her assailant cut her neck three times and left her to bleed to death, in our opinion fully supports the jury's finding of the two aggravating circumstances which were the bases of their decision that the punishment of the defendant for murder in the first degree should be death. There was no evidence of mitigating circumstances.

In determining the sufficiency of the convicting evidence, this court of necessity had to consider the challenges to testimony made by counsel for defendant on appeal. In only one instance, that is the admission of the black and white photographs of the scene of the crimes and the wound in the victim's neck, did trial counsel object to the admission of evidence. On appeal, new counsel also questions (1) the admissibility of the testimony of the examining physicians, (2) the admission of evidence obtained through defendant's detention, arrest, and interrogation, which would include the defendant's statements to officers, his fingerprints, and the blood and saliva samples, and (3) the testimony of the serologist. We find no prejudicial error in the admission of any of this evidence.

 As pointed out by the state, it is basic that the failure of a defendant to timely object to the introduction of testimony is a waiver of appellate review of the issue. *See* T.R.A.P. Rule 36(a); *State v. Harrington,* 627 S.W.2d 345 (Tenn.1981); *State v. Keele,* 644 S.W.2d 435 (Tenn.Crim. App.1982). However, in cases where the defendant is under sentence of death, this court is under the duty to "automatically" review the sentence, which imposes the burden on this court to consider any al-

leged error, whether called to the trial court's attention or not. *See* T.C.A. § 39–2–205(a); *State v. Harries*, 657 S.W.2d 414 (Tenn.1983). In short, there is no waiver of error directed to the admissibility of evidence when the defendant is under sentence of death. However, our review of an alleged error is handicapped at times by the failure of trial counsel to object to the introduction of evidence, as his failure too often deprives the opposing party of the opportunity to remove any question as to the competency and relevancy of questioned evidence. One such instance in this case is the admissibility of defendant's statements, fingerprints, blood and saliva tests obtained as the result of defendant's detention in August, 1982. The defendant never moved to suppress the evidence. His only objection during trial was to Detective David Lames's testimony regarding the statement of the defendant and that objection was on the ground that Lame himself did not take the statement and consequently did not know if the defendant had knowingly waived his *Miranda* rights. With respect to the statements, fingerprints, blood and saliva samples, the proof shows that on August 27, 1982, two policemen asked the defendant to come to the police station in connection with another crime. The defendant was not arrested until later that day when it was determined his fingerprints matched those on the fruit juice bottle. The chronology of that afternoon's events is unclear, but Detective Lame testified the defendant was read his rights and signed a statement voluntarily waiving them. He also, according to Detective Lame, voluntarily agreed to submit to saliva and blood tests and gave several statements to the police. After being charged, he was held in the Sumner County Jail over the weekend until Monday, when he was again advised of his rights, waived them, and gave another statement.

■ On appeal, for the first time the defendant challenges the evidence on constitutional and statutory grounds. Defendant argues the evidence was inadmissible as the fruit of an illegal arrest, because the defendant did not knowingly and intelligently waive his *Miranda* rights, because his statements were coerced, and because his last statement was obtained before he was examined by a magistrate in violation of T.C.A. § 40–5–103. In the absence of an objection or motion challenging the evidence on these grounds, the proof was not directed by either party so as to delineate fully the circumstances surrounding the defendant's detention, arrest, and interrogation; consequently, there is nothing in the record to support the contentions of the defendant.

Defendant insists that the trial court erred in permitting Dr. Norman Saliba and Dr. John Flynn to testify as experts when neither was a qualified forensic pathologist and their testimony was highly speculative and invaded the province of the jury.

Dr. Saliba, who was a general surgeon, the Sumner County Medical Examiner, and an emergency room doctor at the Sumner County Hospital, examined the body at the scene and determined the cause of death (a terminal air embolus caused by the severed jugular vein in the victim's neck). Dr. Flynn, also in emergency medicine at the county hospital, examined the body at the hospital and collected evidence such as vaginal swabs and fingernail scrapings. Neither doctor was a forensic pathologist. The state's examination as to the doctors' qualification was minimal, but the defendant made no objection to their qualifications at trial.

■ Dr. Flynn's testimony, which for the most part describes the examination and tests he had performed, was not improper. Dr. Saliba, however, did go outside his area of expertise in giving his version of how the crime occurred (*e.g.* he deduced from the disarray of store merchandise that the victim had been dragged backwards, her arms flailing, with her attacker's arm choking her about the neck). The defendant did not object to Dr. Saliba's reconstruction of the crime. Since the defendant was not disputing that the victim was murdered and the trial court instructed on expert opinion evidence, the testimo-

ny of Dr. Saliba outside the area of his medical expertise was harmless in our opinion.

The contention that the aggravated rape conviction should be reversed because of the doctors' lack of expertise is baseless in light of the evidence supporting rape (numerous spermatozoa in the vagina, the victim's torn clothing, bruises on her thighs, her body nude from the waist down).

■ The defendant also insists that the trial court erred in admitting in evidence black-and-white photographs of the crime scene and the victim. The questioned photographs were·introduced during Dr. Saliba's testimony. They show the pool of blood in the cooler where the victim was apparently first attacked, the bloody trail from the cooler to the aisle where the victim died, the victim's body as found, and the fatal throat wound. The defendant objected to them as prejudicial. The state argued they were admissible to show premeditation and malice. In ruling that the pictures were admissible in evidence, the trial judge expressed his disagreement with the appellate courts' "liberal" position on the admissibility of photographs and stated he reluctantly admitted the pictures because "the appellate courts take the position there's no such thing as prejudice overcoming the probative value." These statements seem to indicate that the trial judge felt that if photographs are probative they are admissible despite any prejudicial effects and that he failed to weigh probative value versus prejudicial potential as *State v. Banks*, 564 S.W.2d 947 (Tenn.1978), requires.

■ Nevertheless, the photographs of the crime scene and even the body are admissible under *Banks*. Those of the store, though showing blood, are not gruesome and supplement and clarify oral testimony describing the crime scene. Furthermore, the defendant apparently was disputing that a sexual attack occurred, and the photographs of the body showing the arrangement of the victim's clothing were relevant on that issue. The photograph of the throat wound, which was taken after the body had been cleaned, was not necessary in view of the detailed testimony of the medical examiner and should have been excluded in our opinion. However, as in *State v. Banks, supra*, it does not affirmatively appear that the error in admitting this photograph affected the results of the trial. *See also, State v. Melson*, 638 S.W.2d 342, 364–65 (Tenn.1982); T.R. Crim.P. Rule 52(a); T.R.A.P. Rule 36(b).

■ The defendant further argues that the trial court erred in admitting into evidence testimony of the serologist that the defendant was one of thirty-five percent of the male population who are "type O secretors" and therefore could have had intercourse with the victim. The defendant insists the testimony was irrelevant prejudicial, and beyond the scope of expert opinion. The serologist testified, without objection, to the percentage of the population who are male type O secretors. He was qualified to and did testify that the defendant was a type O secretor. It followed that the defendant fell into the suspect percentage. This is not evidence of mathematical probabilities designed to bolster the credibility of scientific tests or other evidence, as in the two cases cited by the defendant, *People v. Harbold*, 464 N.E.2d 734, 746–51 (Ill.App.1984) (chances of identical blood types less than one in five hundred) and *People v. Collins*, 438 P.2d 33 (Cal.1968) (Probability that there was another couple identical to the defendants was one in twelve million).

■ The defendant further insists that the trial judge committed reversible error in its admonishments and comments to the jury on the second day of the trial. The comments complained of are: (1) A statement about recording a television movie for the jurors; (2) An explanation of why the jury must avoid media coverage of the case; and (3) An explanation of why the jurors are not allowed to directly question the witnesses. We see no error here. The remarks were not coercive and did not invite prejudicial speculation on the jurors' parts.

Defendant also takes issue with the prosecutor's closing argument in both guilt and sentencing phases of the trial, insisting the arguments were improper and prejudicial.

■ Again, defense counsel did not object to the state's arguments. Ignoring the fact of waiver, most of the statements described by counsel as "gross misstatements" of the evidence or referring to facts outside the record are legitimate inferences drawn from the proof. In our opinion, none were prejudicial or materially affected the jury's decisions. In finding lack of prejudice, we do not place our stamp of approval on the state's argument that "the presumption of innocence has gotten up and fled the courtroom. It's not here anymore. The presumption of guilt now has taken over and that's enshrouding Mr. David Carl Duncan. The presumption of innocence is not there anymore. Because the facts are in here and you are to consider them." On its face this seems a misstatement of the position in Tennessee that the presumption of innocence remains with the defendant up until the verdict. *See Holt v. State*, 210 Tenn. 188, 357 S.W.2d 57, 61–62 (1961); *Watkins v. State*, 140 Tenn. 1, 203 S.W. 344, 346 (1918), *but see* 22A C.J.S. Criminal Law § 581(c), at 340 (1961). However, the district attorney general may have been trying to express the idea that the presumption was overcome (in reply to the defendant's argument that it was "unimpeachable"), once the jurors were convinced beyond a reasonable doubt from the evidence that the defendant was guilty. In light of the failure of defense counsel to object and the correct instruction by the court on the presumption of innocence, this statement does not seem plain error, nor in our opinion did it materially affect the verdict of the jury.

■ Defendant insists that because of the absence of TBI agent Fortner from the trial, that he was entitled to the benefit of the "missing witness" instruction. We see no merit in this issue. Fortner, who was present as an onlooker when defendant first signed a waiver of his *Miranda* rights and was interrogated, did not possess peculiar knowledge concerning the interrogation. Detective Lame, who did testify, was as familiar with the matter as Fortner and was available to both the State and the defendant. *See State v. Jones*, 598 S.W.2d 209, 224 (Tenn.1980); *State v. Johnson*, 673 S.W.2d 877, 883 (Tenn.Crim.App.1984); *State v. Harris*, 637 S.W.2d 896, 898–99 (Tenn.Crim.App.1982).

■ During the process of instructing the jury, the trial court began to read the pattern "missing witness" instruction then stopped and excused himself, saying, "I beg your pardon. That charge is not applicable." This was not a comment on the evidence contrary to Article VI, § 9 of the Tennessee Constitution as the defendant claims and could not have prejudiced the defendant.

■ Defendant also insists that in the sentencing phase of the trial, the trial court gave instructions to the jury which had the effect of instructing them to disregard the sole mitigating factor of mercy or sympathy for the defendant in their weighing process. The instruction complained of was given in answer to a juror's question of what a "life sentence" means. The court instructed the jury, in substance, not to speculate as to whether a sentence would be carried out, but to consider only the charge as given. Later the court recalled the jury from its deliberations and instructed them to assume that any sentence would be carried out and not to speculate as to anything else. We see no error in the court's instructions, and no prejudice to the defendant.

■ In a supplementary brief filed as a result of this court's opinion in *State v. Williams* (Knoxville, May 20, 1985), the defendant insists that the failure of the trial court to specifically define the words "heinous," "atrocious," "cruel," "torture," and "depravity of mind" used in T.C.A. § 39–2–203(i)(5) was error. In the *Williams* case this court undertook to define the terms as used in the statute and imposed the requirement that in future cases the jury be instructed in the meanings of

the terms. In the present case the trial court gave the pre-*Williams'* instruction with no interpretation of the words. The defendant made no objection. The proof here, that the killer with great force sliced three times deeply into the victim's neck and left her to bleed to death, does support the aggravating circumstance as defined in *Williams*. *See also State v. Dicks*, 615 S.W.2d 126 (1981), *cert. denied*, 454 U.S. 933, 102 S.Ct. 431, 70 L.Ed.2d 240. Additionally, the second aggravating circumstance that the murder was committed while the defendant was engaged in committing rape and robbery was correctly instructed and fully supported by the proof. We therefore see no prejudicial error in the trial court's failure to give the jury a detailed definition of the several terms set forth in the aggravating circumstances described in T.C.A. § 39–2–203(i).

■ Defendant also questions the granting of the state's challenge, on *voir dire*, of juror Margaret Culbreath for cause. Under *Wainwright v. Witt*, —— U.S. ——, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985), a trial court may constitutionally exclude jurors whose views would prevent or substantially impair their performance of duties as jurors in accordance with their instructions and oath. In making this determination the court pointed out that deference must be given to the trial judge, in whose province are findings based on demeanor and credibility. In *Witt* the court was allowed to exclude a juror who was "afraid" or "thought" that her views against the death penalty would interfere with her ability to determine the defendant's guilt.

In the present case, Ms. Culbreath told the court she did not "believe" she could consider the death penalty as an alternative punishment unless she saw the crime committed. On further *voir dire*, she said it was not just the death penalty that she could not consider but that she just did not "want to be put in a position to judge another human being on the basis of what one says against what another person says." She was then excused for cause

without objection. Her dismissal as a prospective juror met the guidelines of *Witt*, *supra* and was proper. *Cf. Green v. State*, 147 Tenn. 299, 247 S.W. 84, 88 (1923) (juror properly discharged who entertained religious scruple against passing judgment against those charged with a crime.).

■ Finally, defendant claims that T.C.A. § 39–2–203 penalizes a defendant who exercises his right to a jury trial in a capital case by exposing him to the possibility of a sentence of death while a defendant who enters a plea of guilty runs no risk of death, and that this is violative of Article I, §§ 6 and 9 of the Tennessee Constitution and the Fifth and Sixth Amendments to the Constitution of the United States. In support of his argument, the defendant relies on *United States v. Jackson*, 390 U.S. 570, 88 S.Ct. 1209, 20 L.Ed.2d 138 (1968), which held that where the death penalty only could be imposed if defendant underwent a jury trial the exercise of one's right to a jury was impermissibly burdened. In *Jackson* a judge could not impose the death sentence.

This is not the situation in Tennessee, where a defendant may waive his right to a jury to determine either guilt, sentence, or both. *See Cozzolino v. State*, 584 S.W.2d 765 (Tenn.1979); T.C.A. § 39–2–204. Furthermore, all references to a "jury" in T.C.A. § 39–2–203 (sentencing for first degree murder) apply to a judge. T.C.A. § 39–2–204. In Tennessee a trial judge may thus impose the death penalty; and, therefore a person who pleads guilty can run the risk of the death penalty. *See* T.R.Crim.P. Rule 11(c)(4).

In the cases cited by defendant, *Commonwealth v. Colon-Cruz*, 393 Mass. 150, 470 N.E.2d 116 (1984), and *State v. Frampton*, 95 Wash.2d 469, 627 P.2d 922 (1981), for constitutional and statutory reasons peculiar to each state, the death penalty could be imposed only if one exercised one's right to trial by jury and never if one entered a plea of guilty. Tennessee's statute in this respect is closer to that of Missouri, which recently rejected a similar argument in

*State v. Bannister,* 680 S.W.2d 141, 144 (Mo. *en banc* 1984).

The defendant's conviction of first degree murder and the sentence of death, and convictions of aggravated rape and armed robbery with consecutive life sentences, are affirmed. The death sentence will be carried out as provided by law on the seventeenth day of December, 1985, unless stayed by appropriate authority. Costs are adjudged against the defendant.

I am authorized to state that Justice Brock concurs in the affirmance of conviction but dissents from the imposition of the death penalty for the reasons expressed in his dissent in *State of Tennessee v. Dicks,* 615 S.W.2d 126, 132 (Tenn.1981).

FONES, HARBISON and DROWOTA, JJ., concur.

BROCK, J., concurs in part and dissents in part.