# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### December 8, 2009 Session

## STATE OF TENNESSEE v. NIGEL KAVIC WATKINS

### Appeal from the Criminal Court for Smith County
### No. 04-194      John Wootten, Judge

---

### No. M2009-00348-CCA-R3-CD - Filed March 1, 2010

---

The Defendant, Nigel Kavic Watkins, was charged with one count of first degree felony murder and one count of aggravated child abuse. Following a jury trial, he was convicted of one count of reckless homicide, a Class D felony, and one count of aggravated child abuse, a Class A felony. See Tenn. Code Ann. §§ 39-13-215(b), -15-402(b). He was sentenced as a Range I, standard offender to four years for reckless homicide and, as a violent offender, to twenty-five years for aggravated child abuse. The trial court ordered him to serve these sentences consecutively, for a total effective sentence of twenty-nine years in the Department of Correction. In this direct appeal, the Defendant contends that: (1) the trial court erred in denying his motion to suppress his statement; (2) the trial court erred in allowing the introduction of certain autopsy photographs; (3) the State presented evidence insufficient to convict him of aggravated child abuse; and (4) the trial court erred in setting the length of his sentence and in ordering consecutive service. We notice as plain error that the Defendant's rights under the Fifth Amendment to the United States Constitution's double jeopardy clause were violated by his dual convictions. After our review, we affirm the Defendant's conviction for aggravated child abuse. We merge the Defendant's reckless homicide conviction into his aggravated child abuse conviction and remand for resentencing.


**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed in Part; Reversed in Part; Remanded**

DAVID H. WELLES, J., delivered the opinion of the Court, in which ALAN E. GLENN and ROBERT W. WEDEMEYER, JJ., joined.

Shawn P. Sirgo, Nashville, Tennessee, for the appellant, Nigel Kavic Watkins.

Robert E. Cooper, Jr., Attorney General and Reporter; Elizabeth T. Ryan, Associate Deputy Attorney General; Angele M. Gregory, Assistant Attorney General; Tom P. Thompson, District Attorney General; and David E. Durham, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### Factual Background

Testimony in this case was heard at a March 13, 2007 hearing on the Defendant's motion to suppress his statement and at his January 8-10, 2008 trial. Testimony at the hearing on the Defendant's motion to suppress established that the events underlying this case began on August 30, 2004. Chief Steve Hopper of the Carthage Police Department ("CPD") testified that on that day, he received a call asking for a responder to go to Carthage General Hospital's ("CGH") emergency room. Chief Hopper sent Assistant Chief Carl Brown and Patrick Warren of the Department of Children's Services. Chief Hopper went to CGH as well. Upon arrival, he spoke with Warren, Asst. Chief Brown, and Emergency Medical Services Director Ricky Slack. He learned that the thirteen-month-old victim had been admitted with serious, possibly non-accidental head injuries. He also learned that the victim's residence contained two other children. Acting on that information, Chief Hopper drove to that residence, on Project Circle in Carthage, intending to remain there until the Department of Children's Services ("DCS") arrived to pick up the other children.

Chief Hopper found the two children at the residence with the Defendant. He asked to speak to the Defendant, telling him that he was not in custody and not under arrest. Chief Hopper did not restrain the Defendant's movement in any way and believed the conversation to be voluntary. The conversation took place in front of Chief Hopper's police vehicle and was recorded by his in-vehicle recording system.

DCS arrived to take the victim's siblings shortly thereafter. Chief Hopper then asked the Defendant if he would go to CPD headquarters to answer some questions about the events preceding the 911 call that resulted in the victim being transported to CGH. The Defendant agreed. After arriving at CPD headquarters, Chief Hopper read the Defendant his rights under Miranda v. Arizona, 384 U.S. 436 (1966). The Defendant initialed each enumerated right on an advice of rights form. He also signed the form, along with Chief Hopper, Asst. Chief Brown, and Mr. Warren, at 4:30 p.m. on August 30. The Defendant was again told that he was not under arrest. The Defendant never indicated any unwillingness to talk.

After the interview, Asst. Chief Brown drove the Defendant back to his Project Circle residence. The victim had since been moved to the emergency room at Vanderbilt Children's Hospital ("VCH"); Chief Hopper spoke on the phone with a doctor there, and then met with Agent Russ Winkler of the Tennessee Bureau of Investigation ("TBI"), whose assistance he had requested. Chief Hopper, Agent Winkler, and Mr. Warren then proceeded to VCH; after about thirty minutes, the Defendant arrived with the victim's mother, Ashley Cannon. They learned from one of the victim's doctors that the victim was still alive, but that a CT scan showed both old and new "bleeds" in his brain. The doctor told Chief Hopper that the victim would probably die.

Another TBI Agent named Locke arrived about that time and asked the Defendant if he would agree to answer some questions at TBI headquarters. The Defendant agreed. The Defendant lacked his own transportation, so he rode to TBI headquarters in the front passenger seat of Agent Locke's vehicle. Chief Hopper sat in the back seat and noted that the vehicle was not equipped with any cages or bars to restrain occupants. Agent Winkler drove his own car to TBI headquarters. They arrived at TBI headquarters at about 10:00 p.m.

Chief Hopper testified that the Defendant was again told he was not in custody or under arrest. They did not restrain the Defendant's movement in any way. The Defendant was offered food, drink, and bathroom breaks. The Defendant never said he wanted to leave. The interview at TBI headquarters produced the statement the Defendant wished to suppress at the hearing; after the interview, Chief Hopper and the others drove the Defendant back to his residence, stopping to eat at a restaurant on the way. Chief Hopper asked the Defendant for consent to search his residence; the Defendant agreed and signed a consent to search form. Chief Hopper took some photographs of the inside of the residence.

On cross-examination, Chief Hopper noted that TBI headquarters was secured such that a person could not enter without a key card. He also noted that the Defendant said he loved the victim and hoped he would recover. The Defendant also claimed to be manic depressive, and noted that he took Zoloft, Xanax, and Celexa.

Agent Winkler also testified at the suppression hearing. He noted that Chief Hopper requested his help with the investigation. In interviewing the Defendant, Agent Winkler noted that law enforcement policy dictated that any caregiver be interviewed when a child has potentially non-accidental injuries. Agent Winkler otherwise corroborated Chief Hopper's account of events, beginning at VCH: the Defendant was told he was not in custody or under arrest either at the hospital or at TBI headquarters. Agent Winkler told the Defendant he was free to leave at any time. He clarified that a key card was not needed in order to exit TBI headquarters. He also testified that he would have arranged transportation had the Defendant wanted to leave. The Defendant signed his statement at 11:59 p.m. on

-3-

August 30. The Defendant was read his statement in its entirety before he signed it. Agent Winkler typed the Defendant's statement for him based on the Defendant's answers to the TBI agents' questions. The interview at TBI headquarters was not recorded.

At about 3:00 p.m. the next day, Agent Winkler and Chief Hopper went to arrest the Defendant at his parents' house in Smith County. The Defendant's father answered the door and told them the Defendant was sleeping. Chief Hopper then received information that the victim had died. Agent Winkler and Chief Hopper left the Smith County residence and obtained a new warrant. They returned at about 5:00 p.m. and arrested the Defendant.

The trial court denied the Defendant's motion to suppress his statement. The Defendant's trial began on January 8, 2007. Nancy Boulton, the victim's grandmother and Ms. Cannon's mother, identified a photograph of the victim taken on his first birthday, about a month before his death. Ms. Boulton testified that, at the time of the victim's death, the Defendant and Ms. Boulton's daughter, Ms. Cannon, lived with her at her Project Circle residence. The victim had two brothers, Wylie and Oliver, who were three and four years old, respectively. The Defendant and Ms. Cannon were romantically involved at the time, although the Defendant was not the father of any of Ms. Cannon's three children. At the time of trial, they were married.

Chief Hopper also testified at trial. He largely reiterated the testimony he had given at the hearing on the Defendant's motion to suppress. The State played the VHS tape containing Chief Hopper's interview with the Defendant outside the Project Circle residence; on the tape, the Defendant claimed that, on August 30, he simply picked up the victim, at which point the victim went limp. On cross-examination, Chief Hopper noted that the Defendant seemed concerned about the victim, that the other children at the Project Circle residence seemed unharmed, and that the Defendant was generally cooperative and "very chatty." He also testified that he spoke to Ms. Cannon before speaking to the Defendant; she spoke to him for a few minutes but then got up and left. Chief Hopper did not speak to her again. As to the events at TBI headquarters, Chief Hopper noted that the Defendant, had he wished to leave, could have called for transportation from the front desk. He also said the Defendant never asked for a lawyer. Chief Hopper did not actively participate in taking the Defendant's statement at TBI headquarters, and he did not take notes on the interview.

Agent Winkler testified at trial. He also largely reiterated his testimony from the hearing on the Defendant's motion to suppress. He added that Chief Hopper relayed to him the information he received from the Defendant upon first interviewing him in front of the Project Circle residence, that the Defendant had said the victim simply went limp after being picked up. Agent Winkler believed that the information he had regarding the victim's head injuries was inconsistent with that account. As to the statement the Defendant gave at TBI

headquarters, Agent Winkler noted that he asked the Defendant questions and typed the Defendant's answers into what became his statement. The Defendant revised his original story two or three times, in ways that Agent Winkler did not find credible, before settling on the version memorialized in his final statement. Agent Winkler provided the statement at trial:

> I understand that I am not under arrest. I have come to the TBI office in Nashville voluntarily to be interviewed about what happened to [the victim]. No threats have been made to me, and no promises have been made to me for giving this statement. I live with Ashley Cannon. We have dated for about a year. We have lived together for about six months. Ashley has three kids that live with us. Her kids are Oliver, Wylie and [the victim]. Oliver is 4. Wylie is 3. [The victim] is 1. The kids' daddy is John Bennett. Earlier today, around 3:00 this afternoon I was just getting up from a nap. Ashley had been taking a nap with me, but she was already up. Ashley and I napped in our bedroom. When we got up [the victim] and the other boys were in their bedroom. Ashley went and got [the victim] and took him downstairs. Then Ashley came back upstairs. She told me she had put [the victim] on the couch in the living room. Ashley then went to the bathroom upstairs. While Ashley was in the bathroom [the victim] started crying downstairs. He was crying really loud. He was crying louder than normal. I went downstairs, and when I got to the bottom of the stairs [the victim] was at the bottom of the stairs. He was on the other side of the baby gate. The baby gate runs across the bottom of the stairs to keep [the victim] from going up the stairs. [The victim] was sitting on the floor. He was crying loud. I stepped over the baby gate. I jerked him up, and when I did he hit his head on the handrail. Even after he hit his head on the handrail he wouldn't stop crying. I lost my temper and I hit his head on the wall opposite of the handrail. I hit his head against the corner of the wall on the opposite side of the handrail. I hit his head against the wall hard. When I hit his head against the wall he went limp in my arms. His eyes rolled back in his head, and he just went limp. When he went limp I got scared and took him up to Ashley. I just told Ashley that [the victim] had gone limp. She told me to call 911, and I did. I waited outside the apartment for the ambulance. Ashley waited outside the apartment with me, and she was holding [the victim] in her arms. He never woke up before the ambulance got there. In the past I've been too rough with [the victim]. I've lost my temper with him some in the past. About a week ago [the victim] was in his crib and he was throwing things at me, and it made me mad. I got up and went over to the crib and I took his head and hit it up against the side of the crib. He just cried real loud, and I gave him his bottle. I knew then I had hit him too hard, and I was

rubbing the back of his head. I've never seen Ashley be rough with [the victim] or the other two boys. Ashley has never seen me be rough with the boys. Today I just lost my temper a bit. It would be fair to say that any injuries [the victim] has I caused.

Signed: [Defendant's signature] 8-30[-]04 11:59 pm

Witness: [Agent Winkler's signature] 8/30/04 11:59 PM

Witness: [Agent Locke's signature] 8/30/04 11:59 pm

Agent Winkler testified that, during the search of the Project Circle residence, the Defendant demonstrated the manner in which he had hit the victim's head against the handrail and the wall. The State introduced pictures of this area into evidence. Agent Winkler confirmed that the stair walls showed no evidence of an impact.

Doctor Richard Rutherford, qualified as an expert witness in the field of medicine, testified that he examined the victim upon his arrival at the CGH emergency room a little after 3:00 p.m. on August 30. The victim was pale, unresponsive to external stimuli, and had bruises on his head and neck. Doctor Rutherford stabilized the victim and, given CGH's lack of imaging technology and expert personnel, had him airlifted to VCH at about 4:00 p.m. After examining the victim, Dr. Rutherford noted "[a]pparent closed head trauma, probably non-accidental." He believed the victim had sustained a severe head injury on the day he was brought to CGH.

Doctor Bradly Strohler, a pediatric intensivist at VCH, was qualified as an expert in pediatrics and pediatric intensive care. He testified that the victim was already intubated upon arrival at VCH. The state introduced a picture of the intubated victim. A neurological exam showed evidence of brain damage. Doctor Strohler concluded that the victim had suffered from traumatic brain injury and multiple bruises "consistent with non-accidental trauma." His secondary diagnoses included shock, hypertension, and bilateral retinal hemorrhages consistent with shaken baby syndrome. Doctor Strohler noted that the victim's August 31 death was caused by brain herniation. He also opined that the victim's injuries were not typical of those usually suffered in the course of routine child activities. He considered the injuries consistent with the Defendant's statement.

Doctor Bruce Levy, Tennessee's Chief Medical Examiner and the Medical Examiner for Davidson County, performed the victim's autopsy. The State introduced a number of autopsy photographs, to which Dr. Levy referred during his testimony. After being qualified as an expert in forensic pathology, Dr. Levy testified that he found evidence of blunt force

injuries on the victim's head, as well as scattered injuries on his body, arms, and legs. He also found evidence of brain swelling. The victim had injuries around and behind his ears and inside his lip, which rarely occurred from accidents. The victim also suffered partial detachment of his retinas, which caused a pooling of blood in his optic nerves. Doctor Levy said this injury was most common in cases of shaken baby syndrome, but could also be caused by blunt force trauma. He believed the autopsy results were consistent with the Defendant's statement; Dr. Levy acknowledged that he had information about the Defendant's confession before performing the autopsy. Doctor Levy concluded that the cause of the victim's death was non-accidental head injury and that the manner of his death was homicide.

The Defendant chose not to testify, but he presented witnesses in his defense. Eudelle Mundy, a retired school teacher, had known the Defendant since serving as his first grade teacher. She also had contact with him during ninth and tenth grade, when she served as a guidance counselor. She testified that the Defendant had no behavioral problems in school, and was known for his peacefulness and nonviolence. She would "never have dreamed" the Defendant could be accused of the crimes charged in this case. On cross-examination, Ms. Mundy admitted she had not known until recently that the Defendant still lived with his parents. She also read the Defendant's statement, and said it "was not the [Defendant] she knows."

Richard Brower had known the Defendant since he was a child. He testified that the Defendant "wouldn't hurt a fly." The Defendant was not a violent person, and Mr. Brower's knowledge of the charges against the Defendant did not change his opinion. Mr. Brower was not aware of the Defendant's statement but said it would not change his opinion.

Daniel Watkins, the Defendant's twenty-five-year-old brother, testified that the Defendant had a reputation for peacefulness in his community and that the charged crimes were totally out of character for him. On cross-examination, Mr. Watkins clarified that he lived in the Project Circle residence with the Defendant, their mother, and Ms. Cannon, but was not present during the events underlying this case.

The jury convicted the Defendant of one count of aggravated child abuse and one count of reckless homicide. He now appeals.

**Analysis**

**I. Denial of Motion to Suppress**

The Defendant first contends that the trial court erred in denying his motion to suppress the statement he gave at TBI headquarters because he was subjected to custodial

interrogation without being given <u>Miranda</u> warnings. <u>See Miranda</u>, 384 U.S. 436, 444. "[A] trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise." <u>State v. Odom</u>, 928 S.W.2d 18, 23 (Tenn. 1996). We review a trial court's applications of law to fact de novo, however. <u>See State v. Walton</u>, 41 S.W.3d 75, 81 (Tenn. 2001). The party prevailing at the suppression hearing is further "entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from such evidence." <u>Odom</u>, 928 S.W.2d at 23.

"[P]olice officers are only obligated to administer <u>Miranda</u> warnings prior to 'custodial interrogation' which has been defined as a 'formal arrest or restraint on freedom of movement of the degree associated with a formal arrest.'" <u>State v. Bush</u>, 942 S.W.2d 489, 499 (Tenn. 1997) (quoting <u>Stansbury v. California</u>, 511 U.S. 318, 323 (1994)). We need not address whether the Defendant was in custody at TBI headquarters, however, because we agree with the trial court's holding that the <u>Miranda</u> warnings given to the Defendant earlier that day were still in effect. Our supreme court has noted that "[a] valid waiver of <u>Miranda</u> rights remains valid unless the circumstances change so seriously that the suspect's answers to interrogation are no longer voluntary or unless the suspect is no longer making a knowing and intelligent waiver of his rights." <u>State v. Rogers</u>, 188 S.W.3d 593, 606 (Tenn. 2006) (citing <u>Wyrick v. Fields</u>, 459 U.S. 42, 47 (1982)). "Courts must examine the totality of the circumstances to determine whether renewed warnings are required." <u>Id.</u> (citing <u>Wyrick</u>, 459 U.S. at 48).

> Factors to be considered when assessing the totality of the circumstances include: 1) the amount of time that has passed since the waiver; 2) any change in the identity of the interrogator, the location of the interview, or the subject matter of the questioning; 3) any official reminder of the prior advisement; 4) the suspect's sophistication or past experience with law enforcement; and 5) any indicia that the suspect subjectively understands and waives his rights. Because of the infinite variety of circumstances a case may present, the list of factors is by no means exhaustive. The weight to be accorded different factors will vary depending on the particular facts of the case.

<u>Id.</u> (internal citations omitted).

Testimony at the Defendant's suppression hearing established that he signed a <u>Miranda</u> rights waiver form at 4:30 p.m on August 30. The interview at TBI headquarters began at about 10:00 p.m., some five-and-one-half hours later. Chief Hopper was still present, although Agent Watkins, who was not present during the Defendant's first interview, appears to have done most of the questioning. The interview location had also changed, but

the subject matter had not. No one appears to have reminded the Defendant of his earlier Miranda waiver. The trial court had little information regarding the Defendant's sophistication or prior experience with law enforcement. Finally, testimony established that the Defendant was "chatty" and very willing to speak to police; the record contains no indication that he resisted signing a Miranda waiver, speaking to Chief Hopper, being interviewed at TBI headquarters, or consenting to a search of his residence.

Under the totality of the circumstances, we conclude that the Defendant's previous Miranda waiver was still in effect at TBI headquarters. Very little time had passed since he initialed and signed a written waiver outlining each of his Miranda rights, and he was questioned about exactly the same subject matter: the circumstances surrounding the victim's death. Multiple law enforcement agents also told him, throughout the day, that he was not obligated to speak to them and could leave at any time. The Defendant took no action indicating a desire to stop his interaction with law enforcement. This issue is without merit.

## II. Admission of Autopsy Photographs

The Defendant next contends that the trial court erred in allowing the State to introduce a number of photographs taken by Dr. Levy during his autopsy of the victim. Only relevant evidence is admissible. See Tenn. R. Evid. 402. Tennessee Rules of Evidence 401 and 403 govern whether evidence is relevant. Trial courts have broad discretion in assessing relevance, and we will not overturn their decisions absent an abuse of discretion below. State v. Stinnet, 958 S.W.2d 329, 331 (Tenn. 1997), State v. Dubose, 953 S.W.2d 649, 653 (Tenn. 1997). The trial court's exercise of discretion may not be reversed unless the court "applied an incorrect legal standard, or reached a decision which is against logic or reasoning that caused an injustice to the party complaining." State v. Shuck, 953 S.W.2d 662, 669 (Tenn. 1997).

The Defendant objected to the introduction of the autopsy photographs as violative of Rule 403, which states that "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice . . . or needless presentation of cumulative evidence." Admission of evidence under Rule 403 is also governed by an abuse of discretion standard. State v. Banks, 271 S.W.3d 90, 116 (Tenn. 2008). The Defendant contended at trial that some of the photographs were inflammatory and tended to unfairly prejudice the jury against him, and that others were cumulative. On appeal, he argues that all of the photographs "were of a gruesome character merely used to inflame and prejudice the jury."

The Defendant notes our holding that "[a]s a general rule, where medical testimony adequately describes the degree or extent of an injury, gruesome and graphic photographs should not be admitted." State v. Collins, 986 S.W.2d 13, 21 (Tenn. Crim. App. 1998)

(citing State v. Duncan, 698 S.W.2d 63, 69 (Tenn. 1985)).  In Collins, the State introduced photographs taken during the autopsy of a newborn child, purportedly for the purpose of demonstrating that the child was a live birth and, thus, that the child's mother could have committed second degree murder by ending the child's life.  Id.  These issues were not contested, however, leading us to conclude that "the photographs were not probative at all."  Id.

We cannot reach a similar conclusion in this case.  The Defendant argued at trial that the injuries he inflicted on the victim were wholly accidental.  Although medical testimony described those injuries in detail, our review shows that the admitted autopsy photographs remained quite probative in their ability to give context to the State's medical testimony, depict the extent and relative positions of the victim's injuries, and facilitate the jury's decision regarding their accidental or non-accidental character.  The photographs are distressing in that they show a deceased thirteen-month-old boy, but we cannot, as the Defendant seems to suggest, simply hold them inadmissible based on that fact alone.  Under these circumstances, we conclude that the trial court did not abuse its discretion in admitting the photographs under Rules 401-403.  This issue is without merit.

## III. Merger

The Defendant was originally charged with one count of first degree felony murder and one count of aggravated child abuse.  Had he been convicted of felony murder rather than reckless homicide, his convictions would not have violated the double jeopardy protections of the Fifth Amendment to the United States Constitution, which states that "[n]o person shall . . . be subject for the same offence to be twice put in jeopardy of life or limb."  See State v. Godsey, 60 S.W.3d 759, 778 (Tenn. 2000) (holding that aggravated child abuse is not a lesser-included offense of felony murder and permitting convictions for both).  Although the Defendant does not raise the issue, we are required to determine whether the trial court committed plain error by allowing the Defendant to be punished twice for the same instance of criminal conduct.

This Court recently considered a similar issue in State v. Erica D. Goodner and Troy Allen Goodner, No. E2007-01048-CCA-R3-CD, 2009 WL 605141 (Tenn. Crim. App., Knoxville, Mar. 10, 2009), perm. to appeal denied, (Tenn. Aug. 17, 2009), a case in which the defendants were convicted of reckless aggravated assault and criminally negligent homicide.  In Goodner we applied the double jeopardy principles explicated by our supreme court in State v. Denton, 938 S.W.2d 373 (1996):

> To ensure that a defendant has not been twice punished for the same offense, Denton requires reviewing courts to engage in the following:

(1) a [Blockburger v. United States, 284 U.S. 299 (1932)] analysis of the statutory offenses;

(2) an analysis, guided by the principles of [Duchac v. State, 505 S.W.2d 237, 239 (Tenn. 1973)], of the evidence used to prove the offenses;

(3) a consideration of whether there were multiple victims or discrete acts; and

(4) a comparison of the purposes of the respective statutes.

Goodner, 2009 WL 605141, at *30-31 (citing Denton, 938 S.W.2d at 381). "None of these steps is determinative; rather the results of each must be weighed and considered in relation to each other." Denton, 938 S.W.2d at 381.

### A. **Blockburger**

In Blockburger, the United States Supreme Court held that, in order to satisfy double jeopardy protections,

[e]ach of the offenses created requires proof of a different element. The applicable rule is that, where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not.

Blockburger, 284 U.S. at 304. We therefore must compare the elements of reckless homicide and aggravated child abuse.

Reckless homicide is "a reckless killing of another." Tenn. Code Ann. § 39-13-215(a). Recklessness refers to a person who is

aware of but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur. The risk must be of such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all of the circumstances as viewed from the accused person's standpoint.

Tenn. Code Ann. § 39-11-302(c). A person commits aggravated child abuse, as applied to the facts of this case, who "commits child abuse . . . and: (1) the act of abuse . . . results in

-11-

serious bodily injury to the child." Tenn. Code Ann. § 39-15-402(a). A person commits simple child abuse who "knowingly, other than by accidental means, treats a child under eighteen (18) years of age in such a manner as to inflict injury."

Reckless homicide thus requires a death, whereas aggravated child abuse does not. Aggravated child abuse requires knowing infliction of injury, whereas reckless homicide does not. The Defendant's convictions therefore do not violate double jeopardy protections under the Blockburger test.

**B. Duchac**

The Duchac "same evidence" test states that

> [a] defendant has been in jeopardy if on the first charge he could have been convicted of the offense charged in the second proceeding. One test of identity of offenses is whether the same evidence is required to prove them. If the same evidence is not required, then the fact that both charges relate to, and grow out of, one transaction, does not make a single offense where two are defined by the statutes. If there was one act, one intent, and one volition, and the defendant has been tried on a charge based on that act, intent, and volition, no subsequent charge can be based thereon, but there is no identity of offenses if on the trial of one offense proof of some fact is required that is not necessary to be proved in the trial of the other, although some of the same acts may necessarily be proved in the trial of each.

Duchac, 505 S.W.2d at 239 (quoting 21 Am. Jur. 2d Criminal Law, § 82).

The Goodner defendants were each convicted of one count of reckless aggravated assault and one count of criminally negligent homicide arising from the violent death of a nineteen-month-old child. The evidence in Goodner encompassed only one instance of violent conduct toward the victim therein; the Goodner victim was then taken to the hospital, where he died shortly thereafter. As such, both the facts and conviction offenses at issue in Goodner bear a striking similarity to those at issue in the instant case.

A reckless homicide conviction does not, of course, rely on exactly the "same evidence" as an aggravated child abuse conviction because the former requires evidence that the victim died. The evidence supporting the Defendant's convictions is identical, however, as it relates to the Defendant's criminal conduct: both of his convictions rest on the same act, namely the impact he caused between the victim's head and the stairway wall in his residence. As in Goodner, we hold that this constitutes the same evidence and, thus, violates principles of double jeopardy.

### C. Multiple Victims and Legislative Purpose

Our application of the "same evidence" test above obviously indicates that the Defendant was not charged with criminal conduct against multiple victims, and was charged as a result of one, discrete act, thus violating the third Denton double jeopardy factor. As to the fourth factor, our reasoning in Goodner again holds true here: "we recognize that the purpose behind both statutes is to protect people from assaultive-type conduct." 2009 WL 605141, at *32.

### D. Plain Error

Based on the analysis above, we conclude that the Defendant has received multiple punishments for the same act, in violation of the Fifth Amendment. The Defendant has waived the merger issue by failing to raise it at trial or in his appellate brief. See Tenn. R. App. P. 36(a) (stating that "[n]othing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error"). We must consider, however, whether the Defendant has established plain error. See Tenn. R. App. P. 52(b). Plain error requires that five factors be established: (1) "the record must clearly establish what happened in the trial court"; (2) "a clear and unequivocal rule of law must have been breached"; (3) "a substantial right of the accused must have been adversely affected"; (4) "the accused did not waive the issue for tactical reasons"; and (5) "consideration of the error is necessary to do substantial justice." State v. Adkisson, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994).

As to factor (1), the record in this case clearly establishes events in the trial court. As to factors (2) and (3), we conclude that our supreme court's interpretation of the Fifth Amendment was breached, adversely affecting a substantial right of the Defendant. See Adkisson, 899 S.W.2d at 639 (noting that a "substantial right" is a right of "fundamental proportions in the indictment process, a right to the proof of every element of the offense, and . . . constitutional in nature."). We see no reason why the Defendant would have waived the issue for tactical reasons, fulfilling factor (4). Finally, under factor (5), we conclude that consideration of a double jeopardy violation is necessary to do substantial justice.

"'Where commission of one crime necessarily involves commission of the second, the offense so involved is said to be merged in the offense of which it is a part . . . . [T]he doctrine of merger does not apply where the offenses are separate and distinct, but only where the identical criminal acts constitute both offenses.'" Goodner, 2009 WL 605141, at *32 (quoting 21 Am. Jur. 2d Criminal Law, § 21 (citations omitted)). We accordingly conclude that the Defendant's conviction for reckless homicide must be merged into his conviction for aggravated child abuse.

**IV. Sufficiency of the Evidence**

The Defendant next contends that the State presented evidence insufficient to convict him of aggravated child abuse. He does not present argument challenging the sufficiency of the evidence that he committed reckless homicide. Tennessee Rule of Appellate Procedure 13(e) prescribes that "[f]indings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt." A convicted criminal defendant who challenges the sufficiency of the evidence on appeal bears the burden of demonstrating why the evidence is insufficient to support the verdict, because a verdict of guilt destroys the presumption of innocence and imposes a presumption of guilt. See State v. Evans, 108 S.W.3d 231, 237 (Tenn. 2003); State v. Carruthers, 35 S.W.3d 516, 557-58 (Tenn. 2000); State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). This Court must reject a convicted criminal defendant's challenge to the sufficiency of the evidence if, after considering the evidence in a light most favorable to the prosecution, we determine that any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 319 (1979); State v. Hall, 8 S.W.3d 593, 599 (Tenn. 1999).

On appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable and legitimate inferences which may be drawn therefrom. See Carruthers, 35 S.W.3d at 558; Hall, 8 S.W.3d at 599. A guilty verdict by the trier of fact accredits the testimony of the State's witnesses and resolves all conflicts in the evidence in favor of the prosecution's theory. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). Questions about the credibility of witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact, and this Court will not re-weigh or re-evaluate the evidence. See Evans, 108 S.W.3d at 236; Bland, 958 S.W.2d at 659. Nor will this Court substitute its own inferences drawn from circumstantial evidence for those drawn by the trier of fact. See Evans, 108 S.W.3d at 236-37; Carruthers, 35 S.W.3d at 557.

Again, a person commits aggravated child abuse, as applied to the facts of this case, who "commits child abuse . . . and: (1) the act of abuse . . . results in serious bodily injury to the child." Tenn. Code Ann. § 39-15-402(a). A person commits simple child abuse who "knowingly, other than by accidental means, treats a child under eighteen (18) years of age in such a manner as to inflict injury." "A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result." Tenn. Code Ann. § 39-11-302(b).

The Defendant argues this issue in his brief as if the statement he made at TBI headquarters contained only an admission to accidentally hitting the victim's head on a handrail after reaching over a baby gate to lift him up. Having endeavored to read the

Defendant's full statement, however, we point out the sentences following that admission:

> Even after [the victim] hit his head on the handrail he wouldn't stop crying. I lost my temper and I hit his head on the wall opposite of the handrail. I hit his head against the corner of the wall on the opposite side of the handrail. I hit his head against the wall hard.

In addition, three medical experts testified that their examinations of the victim led to the belief that the victim's injuries were probably not accidental. This evidence was sufficient to allow any rational jury to conclude that the Defendant, having lost his temper, non-accidentally hit the victim's head against a wall. Any rational jury could also have concluded that the Defendant was aware that such an impact was reasonably certain to cause serious bodily injury to a thirteen-month-old child. This issue is without merit.

## IV. Sentencing

The Defendant argues that the trial court erred in its sentencing determination. The State concedes sentencing error and agrees a remand is necessary. Before a trial court imposes a sentence upon a convicted criminal defendant, it must consider (a) the evidence adduced at the trial and the sentencing hearing; (b) the presentence report; (c) the principles of sentencing and arguments as to sentencing alternatives; (d) the nature and characteristics of the criminal conduct involved; (e) evidence and information offered by the parties on the enhancement and mitigating factors set forth in Tennessee Code Annotated sections 40-35-113 and 40-35-114; and (f) any statement the defendant wishes to make in the defendant's own behalf about sentencing. See Tenn. Code Ann. § 40-35-210(b); State v. Imfeld, 70 S.W.3d 698, 704 (Tenn. 2002). To facilitate appellate review, the trial court is required to place on the record its reasons for imposing the specific sentence, including the identification of the mitigating and enhancement factors found, the specific facts supporting each enhancement factor found, and the method by which the mitigating and enhancement factors have been evaluated and balanced in determining the sentence. See State v. Samuels, 44 S.W.3d 489, 492 (Tenn. 2001).

Upon a challenge to the sentence imposed, this Court has a duty to conduct a de novo review of the sentence with a presumption that the determinations made by the trial court are correct. See Tenn. Code Ann. § 40-35-401(d). However, this presumption "is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). If our review reflects that the trial court followed the statutory sentencing procedure, that the court imposed a lawful sentence after having given due consideration and proper weight to the factors and principles set out under the sentencing law, and that the trial

court's findings of fact are adequately supported by the record, then the presumption is applicable, and we may not modify the sentence even if we would have preferred a different result. See State v. Fletcher, 805 S.W. 2d 785, 789 (Tenn. Crim. App. 1991). We will uphold the sentence imposed by the trial court if (1) the sentence complies with the purposes and principles of the 1989 Sentencing Act and (2) the trial court's findings are adequately supported by the record. See State v. Arnett, 49 S.W.3d 250, 257 (Tenn. 2001). The burden of showing that a sentence is improper is upon the appealing party. See Tenn. Code Ann. § 40-35-401, Sentencing Commission Comments; Arnett, 49 S.W.3d at 257.

### A. Length of Sentence

The Tennessee legislature recently amended several provisions of the Criminal Sentencing Reform Act of 1989, those changes becoming effective June 7, 2005. The Defendant's conduct occurred prior to that date, and he was sentenced after it. As such, the Defendant could have elected to be sentenced under the revised Act by executing a waiver of his ex post facto protections. See Tenn. Pub. Acts ch. 353, § 18. He did not execute such a waiver, however, and therefore should have been sentenced under the 2003 codification of the Act. That codification violated the United States Supreme Court's requirement that, "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury and proved beyond a reasonable doubt." Apprendi v. New Jersey, 530 U.S. 466, 490 (2000). The statutory maximum "is not the maximum sentence a judge may impose after finding additional facts, but the maximum he may impose without any additional findings." Blakely v. Washington, 542 U.S. 296, 305-06 (2004). As such, a trial judge may impose a sentence that exceeds the presumptive sentence based only on the fact of a defendant's prior conviction(s) or on other enhancement factors found by the jury or admitted by a defendant. Id. at 301-04.

The Defendant's sentencing hearing occurred on March 28, 2008. In sentencing the Defendant, the trial court appears to have proceeded under the 2005 codification of the Sentencing Act, noting that it planned to "[use] enhancement factors in an advisory fashion." The court quoted with some approval the State's suggested enhancement factors, including the victim's age and particular vulnerability. See Tenn. Code Ann. § 40-35-114(4). The court, however, declined to make specific factual findings, sentencing the Defendant to twenty-five years for aggravated child abuse "considering these enhancement factors that the State has outlined and all the facts that I've heard in the case." Because the court should have sentenced the Defendant under the old Act, using only prior convictions and facts "submitted to a jury and proved beyond a reasonable doubt" as enhancement factors, see Apprendi, 530 U.S. at 490, we vacate the sentences imposed and remand for resentencing on the Defendant's remaining conviction for aggravated child abuse.

**B. Consecutive Sentencing**

The trial court sentenced the Defendant to serve his sentence for reckless homicide consecutively to his sentence for aggravated child abuse. The trial court did so despite its belief that "our consecutive sentencing statute . . . is unconstitutional as written . . . because it tells a judge to make specific finds of fact beyond that which a jury could have heard," thus, in the trial court's opinion, violating Apprendi and Blakely. The trial court instead relied on the "inherent power of the court to run sentences consecutively." Our decision that the Defendant's reckless homicide conviction must be merged into his aggravated child abuse conviction obviates the need for the trial court to reconsider the issue of consecutive sentencing on remand. We simply wish to note that, shortly after the sentencing hearing in this case, our supreme court held that our consecutive sentencing statute, Tennessee Code Annotated section 40-35-115, does not violate Apprendi or Blakely. See State v. Allen, 259 S.W.3d 671 (Tenn. 2008).

**Conclusion**

Based on the foregoing authorities and reasoning, we conclude that the Defendant's reckless homicide conviction must be merged into his aggravated child abuse conviction. We also conclude that this case must be remanded for resentencing on the aggravated child abuse conviction.

_____
DAVID H. WELLES, JUDGE

-17-