IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
October 29, 2014 Session

# IN RE: JUANITA W.

**Appeal from the Criminal Court for Knox County**
**No. 100392      Steven Sword, Judge**

**No. E2013-02861-COA-R3-JV-FILED-JANUARY 29, 2015**

Juanita W. ("the Juvenile") appeals an order of the Criminal Court for Knox County ("the Criminal Court") finding her delinquent by committing the act of aggravated assault pursuant to Tenn. Code Ann. § 39-13-102(a)(1)(B).  We find and hold that the required element of bodily injury was not proven, and we, therefore, reverse the Criminal Court's order finding the Juvenile delinquent and dismiss the case.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court**
**Reversed; Case Remanded**

D. MICHAEL SWINEY, J., delivered the opinion of the Court, in which CHARLES D. SUSANO, JR., C.J., and JOHN W. MCCLARTY, J., joined.

Mark E. Stephens, District Public Defender, and Christina Kleiser, Assistant Public Defender, Knoxville, Tennessee, for the appellant, Juanita W.

Robert E. Cooper, Jr., Attorney General & Reporter, and John H. Bledsoe, Senior Counsel, for the appellee, State of Tennessee.

**OPINION**

**Background**

The State of Tennessee ("the State") filed a petition alleging that the Juvenile was delinquent for committing the act of aggravated assault pursuant to Tenn. Code Ann. § 39-13-102(a)(1)(B) during an incident that occurred on July 1, 2012.  The State's petition specifically charged Tenn. Code Ann. § 39-13-102(a)(1)(B) and also alleged:

On July 1, 2012, at approximately 9:10 p.m., [the Juvenile] was involved in a physical confrontation with her room mates at [street address]. [The Juvenile] refused to obey Officer Thurman's commands as she screamed and attempted to break down the door where her foster parents and sister were located. [The Juvenile] then retrieved a silver knife with a black handle and came downstairs in a very aggressive manner, with the knife held upright, and refused to drop the knife. Officer Thurman was in fear for the safety of the foster parents and sisters, as well as for himself.

The case was tried before a magistrate judge in the Juvenile Court for Knox County ("the Juvenile Court") and, after trial, an order was entered finding that the Juvenile had committed the delinquent act of aggravated assault pursuant to Tenn. Code Ann. § 39-13-102(a)(1)(B). The magistrate judge's findings, recommendations, and order then were confirmed by the judge of the Juvenile Court.

The Juvenile appealed the Juvenile Court's order to the Criminal Court where the case was tried *de novo* in November of 2013. At trial Officer Thomas Adam Thurman, a patrol officer with the Knoxville Police Department, testified about the incident of July 1, 2012. Officer Thurman, who was on patrol alone at the time, received a call on the evening of July 1, 2012 around 9 or 10 p.m. and in response to the call went to the house where the incident soon occurred. When he arrived at the house, Officer Thurman was met by a neighbor "who reported to [him] that there was something drastic going on in - - in that home right there that [Officer Thurman] was responding to . . .," which Officer Thurman found to be "atypical," and which "kind of raised a flag to [him] right there at the get-go."

Officer Thurman knocked on the door of the house and after a few minutes was admitted by the Juvenile. Officer Thurman testified that the Juvenile:

seemed to be surprised that I was there and was noticeably agitated like she had either been in or was about to be in a physical confrontation. I figured verbal at least. So [the Juvenile] looked at me, opened the door, and then turned and immediately sprinted back into the interior of what I found to be the living area and rounded a corner and got out of my sight real quick.

Officer Thurman followed the Juvenile "as she went around the corner and then went down a big stairwell into a basement." He lost sight of her for two or three seconds, and as he went around the corner, Officer Thurman saw that the Juvenile was at the "base of the stairs and was in a battle with the door there." Officer Thurman described the stairwell stating: "It was real narrow, real tight, not much moving room, but [the Juvenile] was in a verbal argument

with whoever was behind the door, and I didn't know at the time who it was or what was going on behind that door at the base of the stairs."

Officer Thurman attempted to speak to the Juvenile from his position at the top of the stairs, but she did not respond to him. Officer Thurman testified:

> [The Juvenile] was in a big time argument with whoever was behind that door, and I remember her saying some things to the nature of that she was going to get them, she was going to do them, that kind of stuff. So there was some threats going on back and forth behind - - I couldn't hear what was being said from the other side of the door, but I could hear that there was some communication going on there.

Officer Thurman further described that he:

> pretty much eased down the stairs immediately, and I got to about the third step from the bottom or so where I was still at a position overlooking [the Juvenile], and I was trying to get her attention. I was trying to, you know, get her to look at me and respond to me. But she was - - had completely tuned me out or never even acknowledged that I was there, one or the other. I don't know, but either way, I didn't get her attention.

Officer Thurman testified that he was unable to get the Juvenile's attention until he went to the base of the stairs and "physically kind of moved her away from the door," and put his "face in between her face and the door . . . ." Officer Thurman instructed the Juvenile to go back up the stairs so he could figure out what was going on behind the door, and eventually the Juvenile did retreat back up the stairs.

After the Juvenile went back up the stairs, Officer Thurman turned his attention to the door. He stated that he "could tell that there were multiple people back there, but it kind of sounded like there was an argument going on behind that door too." Officer Thurman testified that at that point he was trying to ascertain if he needed to kick the door down or if he needed to keep his attention on the Juvenile. Officer Thurman explained:

> The people inside the room opened the door for me slightly, and I didn't want to go busting in there, 'cause I - - I was already at a big disadvantage as it was. So I - - I kept the door just slightly pulled open so I could see in there, . . . I kept my hand on the doorknob so [the people behind the door] couldn't come out.

Officer Thurman testified that after "maybe eight seconds" during which he was communicating with the people behind the door, he

> heard, you know, a very distinct noise from upstairs. . . . It was a knife, you know, either sliding - - a knife blade against wood or a table or something. I heard that distinct noise. It'd either come out of a butcher's block or, you know, slid off of a table; but as soon as I heard that, you know, I knew that I was in trouble.

Officer Thurman testified that next:

> Maybe a fraction of a second as I'm turning my attention back up to the upper landing, [the Juvenile] comes around the corner, and, you know, she just got that knife in her hand and coming down through there like she's coming down the gauntlet ready to do whatever. . . . She was holding [the knife] in an upright position, coming down through there wielding that thing. . . . [S]he was kind of, you know, cantering down the stairs, but I mean, you know, all I could see is this knife.

Officer Thurman described the knife stating "it was about eight or 10 inches total, something like that, but it had a silver blade and a black handle."

> Officer Thurman testified about what happened next stating:

> Well, as soon as I seen her, you know, I - - I tried to play the situation down some, and just tell her, "Hey, stop that," you know. "Put that down. Stop that." I - - you know, I dropped my voice down, you know, I guess to see if that would help, but it didn't. So she kept coming down there, and it was - - I mean, the landing was only probably four by four, maybe. So I knew if she was going to be down in there with me, that knife was going to be down there with us too. So, I mean, I felt pretty fearful that - - well, actually, I just knew I was going to get stuck. I just didn't know how bad it was going to be. As she was coming down through there, I tried to tell her to drop it, but she wouldn't. . . . I made repeated commands. . . . Probably, I don't know, eight or ten commands as she's coming down them steps. . . . [A]s I kept giving commands, my voice raised back up. I think that's pretty evident on the audio recording that I - - I mean, I escalated my voice to the point where I was screaming.

The Juvenile did not respond to Officer Thurman's commands, but kept coming down the stairs with the knife out.

Officer Thurman thought about using his handgun. He stated that he began to draw his gun and "got it about two or three inches out of the holster . . . ." He stated:

> [F]or whatever reason, I don't know, I just remember thinking that if I use - - if I don't hesitate and I move quickly, I might be able to get my Taser, that I'm probably going to get stuck, but I won't have to shoot her, and I just - - things happened so fast, but when you're thinking about that stuff, it - - it - - you actually think about those things really slowly, and you - - you diagnose - - at least I do. I diagnosed the options that I had, and I went with the Taser, and it worked, and we're all here today so . . .

Officer Thurman further explained:

> I used the Taser system on her, the Taser weapon system. I missed it on the first go, and - - or got it out of the - - it happened so fast. You know, I got it out on the second attempt, and I was able to, you know, deploy it from the belt area, and I got a good - - I got a good hit, a good spread on her, and she folded over on the stairs and kind of dropped - - dropped the knife down, and it hit me in the leg, and I put my foot on the knife, and that was that.

> Gave her a standard deployment with the Taser. She immediately started to get back up, and I gave her another deployment, and she started apologizing, saying she was, "Sorry, sorry, sorry." And then at that point in time I finally had a partner arrive at the top of the stairs. They were trying to communicate with me. I keyed up at some point on the shoulder mike so they could - - everybody could hear the commotion going on, 'cause I knew they weren't going to be able to hear me. So I keyed this up and left it open, you know, for two or three seconds during that initial conversation at the base of the stairs. So I knew I had a bunch of people coming, you know, irregardless of whether they heard me on the actual microphone or not, and then one of my - - it was actually my sergeant that got there first and came down the stairs and put handcuff - - hand restraints on [the Juvenile].

Officer Thurman was asked about when the Juvenile dropped the knife and if the knife cut his clothes or his skin, and he stated:

No. Just kind of hit me in the leg and fell on the floor, and I just stepped on it. She tried to get back up after the first evolution, and - - so I wanted to have my foot on it, 'cause I still had my other hand on the doorknob holding it too.

Officer Thurman testified that after the Juvenile was put in restraints: "I remember saying something to her, but she was really agitated at me at that point. So I just let another sergeant, you know, escort her up the stairs and out. I didn't really say anything after that." Officer Thurman agreed that the Juvenile was one of the strangest juveniles he ever had arrested and stated: "she was like extremely agitated." He stated: "it's troublesome to sit up here and think to myself that I almost used my weapon on a - - . . . 14-year-old . . . . That's troublesome." He stated that he would "classify that as an extreme situation," because he had "not had to almost use [his] weapon on any other juvenile."

Both sides put on expert proof at trial on the issue of whether the Juvenile was able to form the mens rea for aggravated assault. After trial, the Criminal Court entered its order on November 25, 2013 finding and holding "beyond a reasonable doubt that the juvenile is delinquent and in need of treatment and training by committing the delinquent act of Aggravated Assault as charged in the petition." The Juvenile appealed the Criminal Court order to this Court.

**Discussion**

We restate the dispositive issue on appeal as: whether the Criminal Court erred in finding the Juvenile delinquent by the act of aggravated assault pursuant to Tenn. Code Ann. § 39-13-102(a)(1)(B) when the required element of bodily injury was not proven.

When dealing with a juvenile delinquency case, we apply the standard of review as discussed in *State v. Roberts* as follows:

When a defendant challenges the sufficiency of the evidence, an appellate court's standard of review is whether, after considering the evidence in the light most favorable to the state, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 324, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979); *State v. Duncan*, 698 S.W.2d 63, 67 (Tenn. 1985); Tenn. R. App. P. 13(e). In determining the sufficiency of the evidence, this Court should not re-weigh or re-evaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999); *Liakas v. State*, 199 Tenn. 298, 286 S.W.2d 856, 859

(1956). Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. *Liakas*, 286 S.W.2d at 859. This Court must afford the prevailing party the strongest legitimate view of the evidence contained in the record, as well as all reasonable inferences which may be drawn from the evidence. *State v. Evans*, 838 S.W.2d 185, 191 (Tenn. 1992). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. *Id*.

*State v. Roberts*, 106 S.W.3d 658, 662 (Tenn. Ct. App. 2002). As our Supreme Court also has stated:

The child is afforded a number of constitutional and statutory rights and procedures in delinquency proceedings. *See* Tenn. Code Ann. §§ 37-1-120, -124 (2005). These include the right to due process, the right to counsel, the right to introduce evidence, the right to cross-examine witnesses, and the privilege against self-incrimination. Tenn. Code Ann. §§ 37-1-126, -127 (2005).

*State v. Rodgers*, 235 S.W.3d 92, 95 (Tenn. 2007).

Before we address the issue on appeal, we note that the record reveals, and the parties, the Criminal Court, and this Court all have acknowledged, that Officer Thurman did a commendable job during the very dangerous incident upon which this case is based. Officer Thurman's professionalism and ability to think clearly during this life-threatening incident resulted in a resolution that avoided injury or death. The outcome of the incident could have been very different except for Officer Thurman and his actions.

Unfortunately, as the parties agreed during oral argument before this Court, the State charged the wrong statutory section in its petition. It was suggested that perhaps this error occurred as a result of changes to the statutory scheme that had occurred approximately one year prior to the filing of the petition. The error of charging the wrong statutory section, however, never was corrected, and the Criminal Court found the Juvenile delinquent "by committing the delinquent act of Aggravated Assault as charged in the petition."

The statutory section charged in the petition, Tenn. Code Ann. § 39-13-102(a)(1)(B), provided, in pertinent part:

**39-13-102. Aggravated assault.**

(a)(1) A person commits aggravated assault who:

* * *

(B) Recklessly commits an assault as defined in § 39-13-101(a)(1), and:
      (i) Causes serious bodily injury to another; or
      (ii) Uses or displays a deadly weapon.

Tenn. Code Ann. § 39-13-102(a)(1)(B) (Supp. 2011).

**39-13-101. Assault.** – (a) A person commits assault who:

(1) Intentionally, knowingly or recklessly causes bodily injury to another;

Tenn. Code Ann. § 39-13-101(a)(1) (2010).

Thus, in order to prove aggravated assault pursuant to Tenn. Code Ann. § 39-13-102(a)(1)(B) as charged in the petition, the State was required to prove, among the other necessary elements, that the Juvenile caused bodily injury to another. The record on appeal reveals, and the parties do not dispute, that the Juvenile did not cause bodily injury to another during the incident that occurred on July 1, 2012. As such, the State failed to prove that the Juvenile was delinquent by committing the act of aggravated assault pursuant to Tenn. Code Ann. § 39-13-102(a)(1)(B) as charged in the petition.

The State argues on appeal that even though it pled the wrong statutory section when it pled Tenn. Code Ann. § 39-13-102(a)(1)(B), everyone knew what was being tried. The State argues that the Juvenile had notice, despite the statutory charge actually cited in the petition, that she was being charged with aggravated assault by intentionally or knowingly causing Officer Thurman to reasonably fear imminent bodily injury by her using or displaying a deadly weapon. The parties, however, cited us to no juvenile cases involving an issue similar to the one now before us, and we have been unable to locate any after researching the issue. We believe it is critically important in our resolution of this case that the Criminal Court found the Juvenile delinquent in its order "of Aggravated Assault *as charged in the petition*." (emphasis added). The statute charged in the petition was Tenn. Code Ann. § 39-13-102(a)(1)(B).

The State specifically charged Tenn. Code Ann. § 39-13-102(a)(1)(B) in its petition, and the Criminal Court found the Juvenile delinquent "by committing the delinquent

act of Aggravated Assault as charged in the petition." Because it is undisputed that the State failed to prove bodily injury as required by Tenn. Code Ann. § 39-13-102(a)(1)(B), we are constrained to reverse the Criminal Court's order and dismiss this case.

## **Conclusion**

The judgment of the Criminal Court is reversed, this case is dismissed, and this cause is remanded to the Criminal Court for collection of the costs below. The costs on appeal are assessed against the appellee, the State of Tennessee.


_____
D. MICHAEL SWINEY, JUDGE